FILED
United States Court of Appeals
Tenth Circuit

March 21, 2017

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

_____

KEIGHTON BUDDER,

      Petitioner - Appellant,

v.

MIKE ADDISON, Warden,

      Respondent - Appellee.

No. 16-6088

_____

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. No. 5:13-CV-00180-HE)**

_____

Bryan A. Stevenson, Equal Justice Initiative, Montgomery, Alabama (Jennae R. Swiergula and James M. Hubbard, Equal Justice Initiative, Montgomery, Alabama; Perry W. Hudson, Hudson Law Office, Oklahoma City, Oklahoma, with him on the briefs), for Petitioner-Appellant.

Mithun Mansinghani, Deputy Solicitor General (E. Scott Pruitt, Attorney General of Oklahoma; Diane L. Slayton, Assistant Attorney General, with him on the briefs), Oklahoma City, Oklahoma, for Respondent-Appellee.

_____

Before **BRISCOE, MATHESON**, and **PHILLIPS**, Circuit Judges.

_____

**BRISCOE**, Circuit Judge.

_____

Keighton Budder was convicted by an Oklahoma jury of several violent

nonhomicide crimes committed when he was sixteen years old. After sentence

modification on direct appeal, he received three life sentences and an additional sentence of twenty years, all to run consecutively. He will not be eligible for parole under Oklahoma law until he has served 131.75 years in prison. Budder filed a petition for writ of habeas corpus, pursuant to 28 U.S.C. § 2254, contending, as he did on direct appeal, that his sentence violates the Eighth Amendment. In support, he cites Graham v. Florida, 560 U.S. 48 (2010), which held that sentencing juvenile offenders who have not committed homicide crimes to life in prison without a meaningful opportunity for release is unconstitutional. The district court denied Budder's petition, and he appeals. We reverse and remand with instructions to grant Budder's petition.

## I

In the early morning hours of August 11, 2009, when he was sixteen years old, Budder stabbed a seventeen-year-old girl approximately seventeen times and raped her multiple times. On April 1, 2010, an Oklahoma state jury convicted Budder of two counts of first degree rape, one count of assault and battery with a deadly weapon, and one count of forcible oral sodomy. The jury recommended punishment of life without parole for each of the rape charges, life with parole for the assault charge, and twenty years' imprisonment for the forcible sodomy charge. On May 4, 2010, the state trial court sentenced accordingly and ordered the sentences to run consecutively.

Less than two weeks later, the Supreme Court decided Graham, which held that "the Eighth Amendment prohibits a state from imposing a life without parole sentence on a juvenile nonhomicide offender." Id. at 75. Budder filed a direct appeal with the

2

Oklahoma Court of Criminal Appeals (OCCA) and argued that, under <u>Graham</u>, his sentence was unconstitutional and must be modified. On October 24, 2011, the OCCA modified Budder's two life without parole sentences to life with the possibility of parole, but again ordered all of his sentences (three life sentences and a twenty-year sentence) to run consecutively. Aplt. App. at 238–39.

Under Oklahoma law, a prisoner must serve 85% of his sentence before he will be eligible for parole. <u>See</u> Okla. Stat. tit. 21, § 13.1. For purposes of parole, a life sentence is calculated as 45 years. <u>Anderson v. State</u>, 2006 OK CR 6, ¶ 24, 130 P.3d 273, 282–283 (Okla. 2006). Thus, Budder's sentences are considered to total 155 years, and he must serve 131.75 years before he will be eligible for parole.

Budder requested rehearing before the OCCA, again relying on <u>Graham</u>, and asked that his sentences be modified to run concurrently rather than consecutively in order to provide him with a potential of parole in his lifetime. The OCCA denied this petition on November 29, 2011. Aplt. App. at 246–47.

Budder timely filed his petition for habeas relief in federal district court on February 20, 2013. <u>See</u> 28 U.S.C. § 2244(d)(1)(A); <u>Lawrence v. Florida</u>, 549 U.S. 327, 333 (2007). The magistrate judge issued a Report and Recommendation concluding that <u>Graham</u> controlled and Budder should be resentenced. The district court declined to adopt that recommendation and denied Budder's petition, but granted a certificate of appealability.

## II

As a habeas court tasked with review of the OCCA's ruling, our review is circumscribed by § 2254(d) of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  See 28 U.S.C. § 2254(d); Harrington v. Richter, 562 U.S. 86, 92 (2011).  "AEDPA erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court."  Burt v. Titlow, __ U.S. __, 134 S. Ct. 10, 16 (2013).  We may reverse the state court's judgment only if the court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law" or "was based on an unreasonable determination of the facts in light of the evidence presented."[1]  28 U.S.C. § 2254(d).  This high burden is placed on state habeas petitioners because "habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal."  Harrington, 562 U.S. at 102–03 (quoting Jackson v. Virginia, 443 U.S. 307, 332, n.5 (1979) (Stevens, J., concurring in judgment)).  The Court has also cautioned, however,

---

[1]  AEDPA § 2254(d) provides in full:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

4

that "'[e]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review,' and 'does not by definition preclude relief.'" Brumfield v. Cain, __ U.S. __, 135 S. Ct. 2269, 2277 (2015) (quoting Miller-El v. Cockrell, 537 U.S. 322, 340 (2003)).

Each of AEDPA's three prongs — contrary to clearly established federal law, unreasonable application of clearly established federal law, and unreasonable determination of the facts — presents an independent inquiry. 28 U.S.C. § 2254(d); see also Williams v. Taylor, 529 U.S. 362, 404–05 (2000) (holding that the "contrary to" and "unreasonable application" clauses have independent meaning"). Budder argues that the OCCA's decision regarding his sentence is contrary to clearly established federal law, citing that portion of § 2254(d)(1),[2] so we focus on this prong of AEDPA.

---

[2] Budder also argues that the OCCA's decision was an unreasonable application of clearly established federal law. A state court decision "involves an unreasonable application of" clearly established Supreme Court precedent when it unreasonably applies the law to the facts of a particular prisoner's case. Williams, 529 U.S. at 409; Holland v. Allbaugh, 824 F.3d 1222, 1227–28 (10th Cir. 2016). Thus, the "unreasonable application of" prong of § 2254(d)(1) is a better fit for cases involving application of general legal principles to fact-specific inquiries. See, e.g., Carey v. Musladin, 549 U.S. 70, 77 (2006) (noting that "lower courts have diverged widely in their treatment of defendants' spectator-conduct claims" and concluding that "[g]iven the lack of holdings from this Court regarding the potentially prejudicial effect of spectators' courtroom conduct of the kind involved here, it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law'" (quoting 28 U.S.C. § 2254(d)(1))).

By contrast, a state court decision can be "contrary to" Supreme Court precedent only if a prior "case[] confront[s] 'the specific question presented.'" Woods v. Donald, __ U.S. __, 135 S. Ct. 1372, 1377 (2015) (quoting Lopez v. Smith, __ U.S. __, 135 S. Ct. 1, 4 (2014)). A categorical holding answers "the specific question presented" for all cases within the category, so a state court decision that fails to follow a categorical rule is "contrary to" established law, not an "unreasonable application of" it. The other circuit

(continued...)

5

Review under § 2254(d)(1) is a two-step process.  See Yarborough v. Alvarado, 541 U.S. 652, 660–63 (2004).  The first step is to determine the "relevant clearly established law."  Id. at 660 ("We begin by determining the relevant clearly established law.").  As used in the context of AEDPA, "[c]learly established Federal law" means only Supreme Court holdings, not the Court's dicta.  Id.  Federal courts must "look for 'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'"  Id. at 661 (quoting Lockyer v. Andrade, 538 U.S. 62, 71, 72 (2003)).  Thus, at this stage of the inquiry, we look only to Supreme Court decisions that existed at the time the state court rendered its decision, not at later opinions or opinions from lower courts.

After the relevant clearly established law has been determined, the second step is to examine the state court's judgment to determine whether it was either "contrary to, or involved an unreasonable application of" that clearly established law.  28 U.S.C. § 2254(d)(1); see also Carey v. Musladin, 549 U.S. 70, 74–77 (2006) (outlining the relevant Supreme Court precedent in Part II.A. and then considering the state court's application of that precedent in Part II.B.); Yarborough, 541 U.S. at 663 ("We turn now to the case before us and ask if the state-court adjudication of the claim 'involved an

_____

(...continued)
courts to address the meaning of Graham to cases on habeas review have also considered the question under the "contrary to" prong of AEDPA.  See Moore v. Biter, 725 F.3d 1184 (9th Cir. 2013) ("[T]he state court's decision was contrary to the clearly established Federal law set forth in Graham."); Bunch v. Smith, 685 F.3d 546, 551 (6th Cir. 2012) ("[W]e cannot say that Bunch's sentence was contrary to clearly established federal law.").

6

unreasonable application' of clearly established law . . . ."); Williams, 529 U.S. at 390–98 (discussing, in Part III, the precedent set in Strickland v. Washington, 466 U.S. 668 (1984), and then, in Part IV, concluding that the state court's decision was both contrary to and involved an unreasonable application of that precedent). A state court decision is "contrary to" clearly established federal law "if the state court applies a rule that contradicts the governing law set forth" in Supreme Court cases or "if the state court confronts a set of facts that are materially indistinguishable from" a Supreme Court case "and nevertheless arrives at a result different from [that] precedent." Williams, 529 U.S. at 405; Holland v. Allbaugh, 824 F.3d 1222, 1227 (10th Cir. 2016). We must decide in the first instance what governing law has been set forth. Only after we have done so may we determine whether a state court's decision conflicts with that governing law. If we conclude at this second step that, in light of the clearly established federal law, the state court's judgment "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement," then we may grant the petitioner's request for habeas relief. See Harrington, 562 U.S. at 103.

## III

First, we must determine what law was clearly established at the time of the OCCA's decision. Specifically, we must look for the governing legal principle set forth in Graham. At the age of sixteen, Terrance Jamar Graham was charged as an adult for armed burglary with assault or battery, which is a first-degree felony under Florida law

7

and carries a maximum penalty of life imprisonment. Graham, 560 U.S. at 53. He was also charged with attempted armed robbery, which is a second-degree felony under Florida law and carries a maximum penalty of fifteen years' imprisonment. Id. at 53–54. Graham pleaded guilty to both charges. Id. at 54. The state trial court withheld adjudication of guilt and sentenced Graham to concurrent three-year terms of probation, including twelve months in the county jail. Id. Graham was released in June 2004. Id. Less than six months later, he was arrested for a series of crimes: participating in two home invasion robberies during which an accomplice was shot; leading police on a high speed chase while evading arrest; and possessing three handguns. Id. at 54–55. When questioned, Graham admitted to participation in an additional "two to three" robberies. Id. at 55. At the time of this arrest, Graham was thirty-four days shy of his eighteenth birthday. Id. As a result of violating the terms of his probation, Graham was found guilty on the original two charges and sentenced to the maximum term allowed on each — life imprisonment for armed burglary, and fifteen years for attempted armed robbery. Id. at 57. At the time, the state of Florida had no mechanism for parole. Id.

Graham appealed his sentence and raised what the Court described as "a categorical challenge to a term-of-years sentence." Id. at 61. Thus, the Court did not apply a proportionality analysis[3] to the circumstances of Graham's particular case.

---

[3] "The concept of proportionality is central to the Eighth Amendment. Embodied in the Constitution's ban on cruel and unusual punishments is the 'precept of justice that punishment for crime should be graduated and proportioned to [the] offense.'" Graham, 560 U.S. at 59 (alteration in original) (quoting Weems v. United States, 217 U.S. 349, 367

(continued...)

8

Instead, the Court addressed whether life without parole sentences were *categorically* disproportionate and thus invalid under the Eighth Amendment when applied to juvenile nonhomicide offenders.  See id. ("This case implicates a particular type of sentence as it applies to *an entire class of offenders* who have committed a range of crimes." (emphasis added)); id. ("[T]he appropriate analysis is the one used in cases that involved the categorical approach.").  The Court then announced a categorical rule:

> The Constitution prohibits the imposition of a life without parole sentence on a juvenile offender who did not commit homicide.  A state need not guarantee the offender eventual release, but if it imposes a sentence of life it must provide him or her with some realistic opportunity to obtain release before the end of that term.

Id. at 82; see also id. at 75 (explaining the necessity of a categorical rule).  Thus, the Court's holding applies, not just to the factual circumstances of Graham's case, but to all juvenile offenders who did not commit homicide, and it prohibits, not just the exact sentence Graham received, but all sentences that would deny such offenders a realistic

---

(...continued)
(1910)).  The Eighth Amendment "'does not require strict proportionality between crime and sentence' but rather 'forbids only extreme sentences that are "grossly disproportionate" to the crime.'"  Id. at 59–60 (quoting Harmelin v. Michigan, 501 U.S. 957, 997, 1000–01 (1991) (Kennedy, J., concurring in part and concurring in judgment.)).
        Prior to Graham, challenges to term-of-years sentences (meaning non-death penalty sentences) were reviewed according to the proportionality analysis, and categorical analysis was reserved for cases involving the death penalty.  Id. at 60–61.  Thus, Graham presented a new issue for the Court under its Eighth Amendment jurisprudence.  Id. at 61 ("The present case involves an issue the Court has not considered previously:  a categorical challenge to a term-of-years sentence.").

opportunity to obtain release.[4]

Although we reach this conclusion, as we must, by looking only to the Supreme Court's language in Graham, we cannot help but point out that the concurring and dissenting opinions in Graham, as well as the Court's subsequent decisions in Miller v. Alabama, __ U.S. __, 132 S. Ct. 2455 (2012), and Montgomery v. Louisiana, __ U.S. __, 136 S. Ct. 718 (2016), support what is obvious from the text of the majority's opinion in Graham — the Court in Graham announced a categorical rule, not a fact-specific holding.

---

[4] We recognize that the circuit courts do not agree as to what the Court held in Graham. Compare Moore v. Biter, 725 F.3d 1184, 1186 (9th Cir. 2013) (holding that, in Graham, "the United States Supreme Court clearly established that the Eighth Amendment prohibits the *punishment* of life without parole for *juvenile nonhomicide offenders*" (emphasis added)), with Bunch v. Smith, 685 F.3d 546, 550 (6th Cir. 2012) (holding that Graham "did not clearly establish that consecutive, fixed-term sentences for juveniles who commit multiple nonhomicide offenses are unconstitutional when they amount to the practical equivalent of life without parole").

First, we must note that both of these cases involved lengthy fixed-term sentences imposed by state courts. See Moore, 725 F.3d at 1187 (sentence of 254 years); Bunch, 685 F.3d at 547 (sentence of 89 years). Budder, on the other hand, was not sentenced to a lengthy fixed-term, he was sentenced to "life," just as was the defendant in Graham. Thus, these cases regarding lengthy fixed-term sentences addressed an alleged factual distinction that is not relevant in Budder's case. We conclude that Graham addressed *any* sentence that would deny a juvenile nonhomicide offender a realistic opportunity to obtain release, regardless of the label a state places on that sentence. But, even if a material distinction could be drawn between lengthy fixed-terms and "life," that distinction would not apply here.

Second, we note that, given the two-step framework for habeas review, we owe no deference to other courts' decisions regarding what law the Supreme Court clearly established in Graham. We look to our sister circuits' decisions only for their persuasive value. In other words, AEDPA requires that the law be clearly established by the Supreme Court. It must be the Court's holding, not dicta. It must be on point, not a general principle to be extended from another context. But it need not be the case that no other court has ever misinterpreted or failed to follow that clearly established law in order for it to remain "clearly established law."

Chief Justice Roberts wrote separately in Graham because, although he agreed with the majority that "Graham's sentence of life without parole violate[d] the Eighth Amendment," he reached that conclusion by "[a]pplying the 'narrow proportionality' framework to the particular facts of th[at] case." Graham, 560 U.S. at 91 (Roberts, C.J., concurring in the judgment). "Unlike the majority," Chief Justice Roberts "s[aw] no need to invent a new constitutional rule." Id. He wrote that the majority "err[ed]" "in using [Graham's] case as a vehicle for unsettling [the Court's] established jurisprudence and fashioning a *categorical rule applicable to far different cases*." Id. at 96 (emphasis added). Thus, it is clear that Chief Justice Roberts recognized the majority opinion as a categorical holding that reached beyond the facts of Graham's individual circumstances. Similarly, Justice Alito joined Justice Thomas's dissenting opinion but also wrote separately to emphasize that Graham did not raise "an as-applied claim in his petition for certiorari or in his merits briefs before [the Supreme] Court. Instead, [Graham] argued for only a categorical rule banning the imposition of life without parole on *any* juvenile convicted of a nonhomicide offense." Id. at 124–25 (Alito, J., dissenting) (emphasis in original). By this statement, the dissent highlights the question answered by the Graham majority: Does the Eighth Amendment *categorically* bar life without parole sentences for all juvenile offenders who did not commit homicide? According to the Court, it does.

Further, the Court in both Miller and Montgomery characterized the holding in Graham as categorical. Montgomery, 136 S. Ct. at 732 (stating that Graham fell within the line of Supreme Court "precedent holding certain punishments disproportionate when

11

applied to juveniles" and that <u>Graham</u> "held that the Eighth Amendment bars life without parole for juvenile nonhomicide offenders"); <u>id.</u> at 734 (Scalia, J., dissenting) (referring to <u>Graham</u> as an example of a categorical holding); <u>id.</u> (stating that <u>Graham</u> "bar[red] a punishment for all juvenile offenders"); <u>Miller</u>, 132 S. Ct. at 2463–64 (listing <u>Graham</u> as belonging to a set of cases that have "adopted categorical bans on sentencing practices based on mismatches between the culpability of a class of offenders and the severity of a penalty"); <u>id.</u> at 2465 (referring to <u>Graham</u>'s "categorical bar" with respect to life-without-parole sentences imposed on a juvenile for nonhomicide offenses); <u>id.</u> at 2466 n.6 (stating that <u>Graham</u> established "a flat ban" for nonhomicide offenses); <u>id.</u> at 2471 (referring to <u>Graham</u> as an example of a decision that " categorically bar[red] a penalty for a class of offenders or type of crime"); <u>id.</u> at 2476 (Breyer, J., concurring) (stating that "<u>Graham</u> dictates a clear rule:  The only juveniles who may constitutionally be sentenced to life without parole are those convicted of homicide offenses who "kill or intend to kill" (quoting <u>Graham</u>, 560 U.S. at 69)); <u>id.</u> at 2480–81 (Roberts, C.J., dissenting) (stating that <u>Graham</u> "bar[red] life without parole for juvenile nonhomicide offenders"); <u>id.</u> at 2483 (Thomas, J., dissenting) (stating that the Court in <u>Graham</u> "conclude[d] that the Constitution prohibits a life-without-parole sentence for a nonhomicide offender who was under the age of 18 at the time of his offense"); <u>id.</u> at 2489–90 (Alito, J., dissenting) (stating that the Court "held in <u>Graham</u> that a trial judge with discretionary sentencing authority may not impose a sentence of life without parole on a minor who has committed a nonhomicide offense").

When the Court announces that a rule applies to an entire category of offenders, factual distinctions within that category are no longer "material." Thus, when the Court announces a categorical holding, it clearly establishes the law applicable within the defined contours of that category.[5] Federal courts must determine only whether a case falls within the categorical holding announced by the Supreme Court. If it does, the law is clearly established, and the Supreme Court's rule must be applied.

The Graham Court defined its holding with respect to three criteria: (1) the "sentencing practice"; (2) "the nature of the offense"; and (3) "the characteristics of the offender." See Graham, 560 U.S. at 60–61; id. at 61 ("[A] sentencing practice itself is in question. This case implicates a particular type of sentence as it applies to an entire class of offenders who have committed a range of crimes."); id. at 68–69 (considering "the status of the offenders" and then "the nature of the offenses to which this harsh penalty might apply"); id. at 74 (holding that (1) "for a *juvenile offender*" (2) "who *did not commit homicide*" (3) "the Eighth Amendment forbids the *sentence of life without parole*." (emphasis added)). We examine each of these criteria in turn. We conclude, first, that the "sentencing practice" considered by the Court includes any sentence that

---

[5] This conclusion is consistent with Supreme Court holdings that imply categorical rules would have a broader reach than holdings which merely apply principles to facts. See Howes v. Fields, 565 U.S. 499, 505 (2012) (holding that the court of appeals erred in concluding that the law was clearly established by a categorical rule when the Supreme Court had "repeatedly declined to adopt any categorical rule with respect to [the issue]," thereby implying that a categorical rule, if announced, would be clearly established law for all defendants who fell under the rule's purview); Thaler v. Haynes, 559 U.S. 43, 49 (2010) (same).

would deny the offender a realistic opportunity for release in the offender's lifetime; second, that the Court's analysis regarding "the nature of the offense" applies to all nonhomicide offenses, regardless of the number or severity of those offenses; and, third, that the Court's analysis regarding "the characteristics of the offender" applies to any offender who was under the age of eighteen at the time of his or her offense.

## A.    The Sentencing Practice

The Court in Graham considered all "sentences that deny convicts the possibility of parole." Id. at 70. The Court repeatedly referred to these sentences as "life without parole sentences," see, e.g., id. at 62, but a sentencing court need not use that specific label for a sentence to fall within the category considered by the Court. In fact, it is important to note that Graham himself was not sentenced to "life without parole"; he was sentenced to "life." Id. at 57. It was only because the State of Florida had abolished its parole system that Graham would have no opportunity to obtain release. Id. The Court in Graham focused, not on the label attached to the sentence, but on the irrevocability of the punishment. Id. ("[T]his sentence means denial of hope."); id. ("[T]he sentence alters the offender's life by a forfeiture that is irrevocable. It deprives the convict of the most basic liberties without giving hope of restoration."); id. at 74 ("By denying the defendant the right to reenter the community, the State makes an irrevocable judgment about that person's value and place in society."). In this context, there is no material distinction between a sentence for a term of years so lengthy that it "effectively denies the offender any material opportunity for parole" and one that will imprison him for "life" without the

14

opportunity for parole — both are equally irrevocable.  Id. at 113 n.11 (Thomas, J.,

dissenting) ("It is difficult to argue that a judge or jury imposing such a long sentence —

which effectively denies the offender any material opportunity for parole — would

express moral outrage at a life-without-parole sentence."); see also Moore, 725 F.3d at

1191 ("Moore's sentence of 254 years is materially indistinguishable from a life sentence

without parole because Moore will not be eligible for parole within his lifetime.").

Despite Oklahoma's arguments to the contrary, we cannot read the Court's

categorical rule as excluding juvenile offenders who will be imprisoned for life with no

hope of release for nonhomicide crimes merely because the state does not label this

punishment as "life without parole."  The Constitution's protections do not depend upon a

legislature's semantic classifications.[6]  Limiting the Court's holding by this linguistic

---

[6] Cf. Nat'l Fed'n of Indep. Bus. v. Sebelius, __ U.S. __, 132 S. Ct. 2566, 2594–95 (2012) (taking a "functional approach" to decide whether a provision labeled a "penalty" was constitutional as a tax, because the label chosen by Congress does not "control whether an exaction is within Congress's constitutional power to tax"); Freytag v. Commissioner, 501 U.S. 868, 881 (1991) (concluding that "a special trial judge is an 'inferior Officer' whose appointment must conform to the Appointments Clause" because "the degree of authority exercised by the special trial judges [was] so 'significant' that it was inconsistent with the classifications of 'lesser functionaries' or employees"); Bernal v. Fainter, 467 U.S. 216, 223–24 (1984) (holding that, in the context of an equal protection claim, the question of whether "notaries public fall within that category of officials who perform functions that 'go to the heart of representative government,'" does not depend upon the state's designation of notaries because the "Court has always looked to the actual function of the position as the dispositive factor" (quoting Sugarman v. Dougall, 413 U.S. 634, 647 (1973))); Complete Auto Transit, Inc. v. Brady, 430 U.S. 274, 285 (1977) (noting that courts should not "attach[] constitutional significance to a semantic difference"); Ry. Express Agency v. Virginia, 358 U.S. 434, 441 (1959) (noting that a legislature may not "effect a validation of a tax, otherwise unconstitutional, by merely changing its descriptive words").

distinction would allow states to subvert the requirements of the Constitution by merely sentencing their offenders to terms of 100 years instead of "life." The Constitution's protections are not so malleable.

More importantly, the Court did not just hold that it violated the Eighth Amendment to sentence a juvenile nonhomicide offender to life without parole; it held that, when a state imposes a sentence of life on a juvenile nonhomicide offender, it must provide that offender with a "meaningful opportunity to obtain release." Id. at 75; see also id. ("[The Eighth Amendment] does prohibit States from making the judgment at the outset that those offenders never will be fit to reenter society."). Further, the Court explained that its categorical holding was necessary because it would "give[] *all* juvenile nonhomicide offenders a chance to demonstrate maturity and reform." Graham, 560 U.S. at 79 (emphasis added). If the rule announced in Graham is to provide all juvenile offenders such an opportunity, it must be read to apply to all sentences that are of such length that they would remove any possibility of eventual release. Thus, we conclude, the sentencing practice that was the Court's focus in Graham was any sentence that denies a juvenile nonhomicide offender a realistic opportunity to obtain release in his or her lifetime, whether or not that sentence bears the specific label "life without parole."

## B. The Nature of the Offense

The Court in Graham considered all juvenile offenders who had not committed homicide, regardless of the number or severity of nonhomicide crimes committed. The Court defined the nature of the offense in this way because it drew a "moral" distinction

16

between homicide and nonhomicide crimes — a difference in kind.  See Graham, 560

U.S. at 69.  According to the Court, "[t]here is a line 'between homicide and other serious

violent offenses against the individual.'  Serious nonhomicide crimes 'may be devastating

in their harm . . . but 'in terms of moral depravity and of the injury to the person and to

the public,' . . . they cannot be compared to murder in their 'severity and irrevocability.'"

Id. (alteration in original) (quoting Kennedy v. Louisiana, 554 U.S. 407, 438 (2008)).

"Although an offense like robbery or rape is 'a serious crime deserving serious

punishment,' those crimes differ from homicide crimes in a moral sense."  Id. (quoting

Enmund v. Florida, 458 U.S. 782, 797 (1982)).  Therefore, "defendants who do not kill,

intend to kill, or foresee that life will be taken are categorically less deserving of the most

serious forms of punishment than are murderers."  Id.

At no point did the Court draw any distinctions with regard to the severity or

number of nonhomicide crimes a defendant had committed or indicate that anything short

of homicide would rise to the level of moral culpability that could justify a sentence of

life without parole for a juvenile offender.  Again, we decline Oklahoma's invitation to

invent distinctions that were not drawn by the Court.  To the contrary, the Court

specifically referred to offenders with multiple crimes and multiple charges, including

Budder himself,[7] as offenders who, as juveniles, regardless of their nonhomicide crimes,

---

[7] At that time, the OCCA had not yet modified Budder's two "life-without-parole" sentences to "life" sentences.  This distinction, however, does not detract from the fact that the Court, although aware of Budder's multiple charges and corresponding multiple sentences, considered him as part of the category addressed in Graham.

17

were not sufficiently culpable to deserve a sentence of life without the opportunity for parole. See, e.g., id. at 64 (citing a news article about Budder's sentence); id. at 76–77 (referring to an offender's "past encounters with the law" and the "second and third chances" he had been given); id. at 79 (referring to Graham's multiple "bad acts," "crimes," and "mistakes").

Again, we must emphasize that states may not circumvent the strictures of the Constitution merely by altering the way they structure their charges or sentences. Just as they may not sentence juvenile nonhomicide offenders to 100 years instead of "life," they may not take a single offense and slice it into multiple sub offenses in order to avoid Graham's rule that juvenile offenders who do not commit homicide may not be sentenced to life without the possibility of parole. When the Court compared the severity of the crime with the severity of the punishment, in light of the characteristics of the offender, it did not look to the state's definitions or the exact charges brought. It looked to whether the offender was a juvenile, whether the offender killed or intended to kill the victim, and whether the sentence would deny the offender any realistic opportunity to obtain release. The Court specifically concluded that, not only was a categorical rule appropriate, it was "necessary," id. at 75, because a case specific approach "would allow courts to account for factual differences between cases and to impose life without parole sentences for particularly heinous crimes," id. at 77. The Court found this approach to pose too great a risk that some juveniles would receive life without parole sentences "despite insufficient culpability." Id. at 78 (quoting Roper, 543 U.S. at 572–73). The Court was not

18

convinced "that courts taking a case-by-case proportionality approach could with sufficient accuracy distinguish the few incorrigible juvenile offenders from the many that have the capacity for change." Id. at 77. Not only did the Court draw the line at homicide, it structured a categorical rule specifically to prevent the possibility that a sentencing judge would ever impose a sentence of life without the possibility of parole on a juvenile who did not commit homicide. The Eight Amendment prohibits such a sentence, regardless of the severity of nonhomicide crimes a juvenile has committed.

**C.     The Characteristics of the Offender**

The Court in Graham considered the unique characteristics of offenders who committed their crimes before reaching the age of eighteen. The Court had previously established in Roper v. Simmons, 543 U.S. 551 (2005), "that because juveniles have lessened culpability they are less deserving of the most severe punishments." Graham, 560 U.S. at 68 (quoting Roper, 543 U.S. at 569). The Court stated that it had no "reason to reconsider the Court's observations in Roper about the nature of juveniles" and "developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds." Id. The Court addressed these differences at length in its discussion of whether "the culpability of the offenders at issue," "in light of their crimes and characteristics," was proportionate to "the severity of the punishment in question." Id. at 67. Throughout this part of the opinion, the Court's analysis relied upon the age of the offender as the distinguishing characteristic.

First, the Court noted that, "[a]s compared to adults, juveniles have a 'lack of

19

maturity and an underdeveloped sense of responsibility'; they are 'more vulnerable or susceptible to negative influences and outside pressures, including peer pressure'; and their characters are 'not as well formed.'" Id. at 68 (quoting Roper, 543 U.S. at 569). "Accordingly, 'juvenile offenders cannot with reliability be classified among the worst offenders.'" Id. (quoting Roper, 543 U.S. at 569). Further, "[j]uveniles are more capable of change than are adults, and their actions are less likely to be evidence of 'irretrievably depraved character' than are the actions of adults." Id. (quoting Roper, 543 U.S. at 570).

Second, the Court noted that "life without parole is 'the second most severe penalty permitted by law.'" Id. at 69 (quoting Harmelin, 501 U.S. at 1001). But not only is it a severe penalty for all who receive it, it "is an especially harsh punishment for a juvenile" because "[a] 16-year-old and a 75-year-old each sentenced to life without parole receive the same punishment in name only." Id. at 70. "[A] juvenile offender will on average serve more years and a greater percentage of his life in prison than an adult offender." Id.

Third, the Court concluded that none of the recognized goals of penal sanctions — retribution, deterrence, incapacitation, and rehabilitation — justified the sentence of "life without parole for juvenile nonhomicide offenders." Id. at 71. In this discussion, the Court noted that retribution was not proportional, given the reduced culpability of juveniles, id., that juveniles' lack of maturity prevented a justification of deterrence, id. at 72, and that incapacitation was inadequate to justify the punishment because "incorrigibility is inconsistent with youth," id. at 72–73 (quoting Workman v.

20

Commonwealth, 429 S.W.2d 374, 378 (Ky. App. 1968)). All three of these conclusions are dependent upon the age of the offender.

Therefore, we conclude that the Court's categorical rule in Graham covered all offenders who committed their crimes before the age of eighteen and who did not kill, intend to kill, or foresee that life would be taken. It compared the culpability of these offenders to the severity of the sentence, in this case any sentence that would deprive the offender of a realistic opportunity for release in his or her lifetime. The Court concluded that such sentences were categorically unconstitutional when applied to these juvenile offenders. Id. at 75. Although "[a] State is not required to guarantee eventual freedom to a juvenile offender convicted of a nonhomicide crime," it must provide "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." Id.

**IV**

We come, then, to the ultimate question presented here: Does Budder's case fall within Graham's categorical holding? We say again, in the words of the Supreme Court:

> The Constitution prohibits the imposition of a life without parole sentence on a juvenile offender who did not commit homicide. A state need not guarantee the offender eventual release, but if it imposes a sentence of life it must provide him or her with some realistic opportunity to obtain release before the end of that term.

Id. at 82. Like Graham, Budder committed his crimes as a juvenile. Like Graham, Budder did not commit homicide. Like Graham, Budder received a life sentence — in fact, even more harshly, he received three consecutive life sentences. And, like Graham, Budder's sentence does not provide him a realistic opportunity for release; he would be

21

required to serve 131.75 years in prison before he would be eligible for parole. No fairminded jurist could disagree with these conclusions. In fact, Oklahoma does not even contest them. Thus, under the categorical rule clearly established in Graham, Budder's sentence violates the Eighth Amendment. The OCCA's judgment was contrary to this clearly established Supreme Court precedent.[8] Accordingly, we reverse and remand with instructions to grant Budder's petition for writ of habeas corpus, to vacate Budder's sentence, and to direct the State of Oklahoma to resentence Budder within a reasonable period.

---

[8] The OCCA's opinion provides little to no analysis to guide our understanding of how it read and applied the Supreme Court's rule from Graham. In the absence of an explanation from the state court, we consider the arguments that might have supported its decision. See Harrington, 562 U.S. at 102 ("Under § 2254(d), a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court."). In this case, we do not know whether the OCCA applied the wrong rule by reading Graham too narrowly, or if it identified the correct rule, but applied it to materially indistinguishable facts and yet reached a contrary conclusion. See Williams, 529 U.S. at 405. In either case, we conclude that the OCCA's judgment was contrary to the Court's holding in Graham, which requires that Budder's sentence be vacated.