*1135 JUSTICE GABRIEL,
concurring in the judgment.
¶32 In this and a number of other cases decided today, the majority concludes that the United States Supreme Court’s opinions in Graham v. Florida, 560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010), and Miller v. Alabama, 567 U.S. 460, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012), are limited to cases in which a juvenile offender receives the “specific sentence” of life . without parole (“LWOP”). Maj. op. ¶ 15. The majority thus concludes that Graham and Miller do not apply to cases in which a juvenile receives consecutive term-of-years sentences even if the aggregate sentence amounts, in practical effect, to an LWOP sentence.
¶33 In my view, the majority has misper-ceived and unduly limited the reach of Graham and Miller. I would conclude, instead, that Graham and Miller apply to de facto LWOP sentences. I would further conclude, however, that on the record before us, Luce-ro has not established that he, in fact, received a de facto LWOP sentence in this case.
V34 Accordingly, I respectfully concur in the judgment only.
I. Analysis
¶35 I begin by discussing the United States Supreme Court’s recent jurisprudence in this area, and I explain why I believe that Graham and Miller apply to de facto LWOP sentences for juveniles. I then proceed to apply that principle to the present ease.
A. U.S. Supreme Court’s Recent Jurisprudence on Juvenile Sentencing
¶36 In Roper v. Simmons, 543 U.S. 551, 555, 568, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), the Supreme Court reconsidered the question of whether the Constitution bars capital punishment for juvenile offenders who were older than fifteen but younger than eighteen when they committed a capital crime, ultimately concluding that it is unconstitutional to impose the death penalty on offenders who were under eighteen at the time of their offenses. In so ruling, the Court relied heavily on social science research indicating that juveniles have lessened culpability and are less deserving of the most severe punishments; Id. at 569-75, 125 S.Ct. 1183. This research led the Court to opine that juvenile offenders are fundamentally different from adults for purposes of sentencing because (1) they lack maturity and have “an underdeveloped sense of responsibility”; (2) they “are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure”; and (3) their characters are “not as well formed” as those of adults. Id. at 569-70, 125 S.Ct. 1183 (quoting Johnson v. Texas, 509 U.S. 350, 367, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993)). Based on these characteristics, the Court stated, “It is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption,” Id. at 573, 125 S.Ct. 1183.
¶37 In Graham, 560 U.S. at 74, 130 S.Ct. 2011, the Court extended its holding in Roper to LWOP sentences for juveniles who had committed nonhomieide offenses. In Graham, the juvenile offender had committed a number of serious crimes while he was on probation. Id. at 54-56, 130 S.Ct. 2011. The trial court ultimately revoked the juvenile’s probation and sentenced him to the maximum sentence of life in prison. Id. at 56-57, 130 S.Ct. 2011. Because Florida had abolished its parole system, this sentence gave the juvenile no possibility of release unless he was granted executive clemency. Id. at 57, 130 S.Ct. 2011.
¶38 The juvenile challenged his sentence on appeal, and the Supreme Court ultimately held that “for a juvenile offender who did not commit homicide the Eighth Amendment forbids the sentence of life without parole.” Id. at 74, 130 S.Ct. 2011. In reaching this conclusion, the Court explained:
A State is not required to guarantee eventual freedom to a juvenile offender convicted of nonhomicide crime. What the State must do, however, is give defendants like Graham some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation. It is for the State, *1136 in the first instance, to explore the means and mechanisms for compliance. It bears emphasis, however, that while the Eighth Amendment prohibits a State from imposing a life without parole sentence on a juvenile nonhomicide offender, it does not require the State to release that offender during his natural life. Those who commit truly: horrifying crimes as juveniles may turn out to be irredeemable, and thus deserving of incarceration for the duration of their lives. The Eighth Amendment does not foreclose the possibility that persons convicted of nonhomieide crimes committed before adulthood will remain behind bars for life. It does prohibit States from making the judgment at the outset that those offenders never will be fit to reenter society.
Id. at 75, 130 S.Ct. 2011 (emphasis added).
¶39 The Court added that the rule that it was adopting gave “all juvenile nonhomicide offenders a chance to demonstrate maturity and reform. The juvenile should not be deprived of the opportunity to achieve maturity of judgment and self-recognition of human worth and potential.” Id. at 79, 130 S.Ct. 2011 (emphasis added).
¶40 In addition, as in Roper, the Court relied heavily on social science research and principles. For example, the Court surveyed LWOP sentences for juvenile nonhomicide offenders and concluded, “The sentencing practice now under consideration is exceedingly rare. And ‘it is fair to say that a national consensus has developed against it.’ ” Id. at 67, 130 S.Ct. 2011 (quoting Atkins v. Virginia, 536 U.S. 304, 316, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002)). In addition, the Court reiterated its view that juvenile offenders are fundamentally different from adults for purposes of sentencing because (1) they lack maturity and have “an underdeveloped sense of responsibility”; (2) they “are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure”; and (3) their characters are “not as well formed.” Id. at 68, 130 S.Ct. 2011 (quoting Roper, 543 U.S. at 569-70, 125 S.Ct. 1183).
¶41 In expressing this view, the Court noted:
[Developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds. For example, parts of the brain involved in behavior control continue to mature through late adolescence. Juveniles are more capable of change than are adults, and their actions are less likely to be evidence of “irretrievably depraved character” than are the actions of adults. It remains true that “[fjrom a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor’s character deficiencies will be reformed.”
Id. at 68, 130 S.Ct. 2011 (emphasis added) (citations omitted) (quoting Roper, 543 U.S. at 570, 125 S.Ct. 1183). The Court thus opined, “[Wjhen compared to an adult mur-dei*er, a juvenile offender who did not kill or intend to kill has a twice diminished moral culpability. The age of the offender and the nature of the crime each bear on the analysis.” Id. at 69, 130 S.Ct. 2011.
¶42 In light of the foregoing, and particularly given the unique psychological characteristics of juvenile offenders, the Court concluded that an LWOP sentence for a juvenile nonhomicide offender cannot be justified by the valid penological goals of retribution, deterrence, incapacitation, and rehabilitation. Id. at 71-74, 130 S.Ct. 2011. To the contrary, such a sentence would be “an especially harsh punishment for a juvenile” because it “means denial of hope; it means that good behavior and character improvement are immaterial; it means that whatever the future might hold in store for the mind and spirit of [the convict], he will remain in prison for the rest of his days.” Id. at 70-71, 130 S.Ct. 2011 (quoting Naovarath v. State, 105 Nev. 525, 779 P.2d 944, 944 (1989)).
¶43 Finally, in Miller v. Alabama, 132 S.Ct. at 2460, the Court extended the reasoning of Roper and Graham, this time holding that “mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment’s prohibition on ‘cruel and unusual punishments.’” As in Roper and Graham, the Court recognized that for sentencing purposes, juveniles are constitutionally different from adults because *1137 they have “diminished culpability and greater prospects for reform” and therefore are less deserving of the most severe punishments. Id. at 2464. In addition, the Court reiterated its views that children (1) lack maturity and have an underdeveloped sense of responsibility, leading to “recklessness, impulsivity, and unnecessary risk-taking”; (2) are particularly vulnerable to negative influences and outside pressures, leading to more limited control over their environments and the inability to extricate themselves from crime-producing settings; and (3) have characters that are not as well formed as those of adults and traits that are less fixed, making a child’s actions less likely to evince irretrievable depravity. Id.
¶44 And as pertinent here, the Court stated:
Most fundamentally, Graham insists that youth matters in determining the appropriateness of a lifetime of incarceration without the possibility of parole. In the circumstances there, juvenile status precluded a life-without-parole sentence, even though an adult could receive it for a similar crime. And in other contexts as well, the characteristics of youth, and the way they weaken rationales for punishment, can render a life-without-parole sentence disproportionate. “An offender’s age,” we made clear in Graham, “is relevant to the Eighth Amendment,” and so "criminal procedure laws that fail to take defendants’ youthfulness into account at all would be flawed.”
Id. at 2465-66 (quoting Graham, 560 U.S. at 76, 130 S.Ct. 2011).
¶45 Applying the foregoing principles, several of the could of appeals divisions whose opinions are before us today and many courts across the country have concluded that the rationale of the above-described Supreme Court cases extends to cases in which a juvenile offender receives the functional equivalent of an LWOP sentence. See, e.g., Budder v. Addison, 851 F.3d 1047, 1053 & n.4 (10th Cir. 2017); Moore v. Biter, 725 F.3d 1184, 1191-92 (9th Cir. 2013); People v. Caballero, 55 Cal.4th 262, 145 Cal.Rptr.3d 286, 282 P.3d 291, 293, 295 (2012); Casiano v. Comm’r of Corr., 317 Conn. 52, 115 A.3d 1031, 1044-15 (2015); Henry v. State, 175 So.3d 675, 679-80 (Fla. 2015); People v. Nieto, 402 Ill.Dec. 521, 52 N.E.3d 442, 452 (Ill. App. Ct. 2016); State v. Null, 836 N.W.2d 41, 71 (Iowa 2013); State v. Zuber, 227 N.J. 422, 152 A.3d 197, 211-12 (2017); State v. Ramos, 187 Wash.2d 420, 387 P.3d 650, 658 (2017); Bear Cloud v. State, 334 P.3d 132, 141-42 (Wyo. 2014).
¶46 As one court aptly put it:
A term of years effectively denying any possibility of parole is no less severe than an LWOP term. Removing the “LWOP” designation does not confer any greater penological justification. Nor does tinkering with the label somehow increase a juvenile’s culpability. Finding a determinate sentence exceeding a juvenile’s life expectancy constitutional because it is not labeled an LWOP sentence is Orwellian. Simply put, a distinction based on changing a label, as the trial court did, is arbitrary and baseless.
People v. Nunez, 195 Cal.App.4th 414, 125 Cal.Rptr.3d 616, 624 (2011) (review dismissed Oct. 17, 2012).
¶47 In my view, the Nunez court’s rationale properly captures the import of the Supreme Court eases discussed above. Those cases reflect an unmistakable progression toward providing more protection for juvenile offenders facing a potential sentence of life behind bars with no realistic opportunity for release. To that end, the Supreme Court’s cases make abundantly clear that (1) juveniles are fundamentally different because, among other things, they lack maturity, have an underdeveloped sense of responsibility, are more vulnerable to and susceptible' of negative influences, and have characters that are not well formed; (2) juveniles are more capable of change than adults; (3) LWOP sentences are especially harsh on juveniles because they mean a denial of hope, and they suggest that good behavior and character are immaterial;' and (4) youth matters, and juvenile offenders must be given the opportunity to obtain release based on demonstrated maturity and rehabilitation.
¶48 These principles apply equally to both a literal LWOP term and a de facto one. Indeed, as noted above, Graham itself did not *1138 involve a literal LWOP prison term. Graham, 560 U.S. at 56-57, 130 S.Ct. 2011. Rather, the life sentence at issue amounted to a de facto LWOP term because Florida had abolished its parole system. See id. at 57, 130 S.Ct. 2011. As the Nunez court stated, a term-of-years sentence that effectively denies a juvenile offender any possibility of parole is no different from a literal LWOP sentence. See Nunez, 125 Cal.Rptr.3d at 624. Thus, approving a term-of-years sentence that results in a de facto LWOP prison term, as the majority has done today, is directly contrary to the Supreme Court’s dear mandate that juvenile offenders must be given a meaningful and realistic opportunity to obtain release based on demonstrated maturity and rehabilitation. See Graham, 560 U.S. at 75, 82, 130 S.Ct. 2011.
¶49 For these reasons, I respectfully disagree with the majority’s conclusion that Graham and Miller do not apply to term-of-years sentences resulting in de facto LWOP prison terms. I would conclude, instead, that Graham and Miller apply to such sentences, and in my view, the question before us should turn on whether the sentence at issue was, in fact, a de facto LWOP sentence.
¶50 I am not persuaded otherwise by the majority’s reliance, see maj. op. ¶ 21, on the distinction made in Miller between mandatory sentencing schemes and other types of sentences. As the majority observes, in Miller, 132 S.Ct. at 2474-75, the Supreme Court noted that “a judge or jury could choose, rather than a life-without-parole sentence, a lifetime prison term with the possibility of parole or a lengthy term of years.” Maj. op. ¶ 21. The majority concludes that this distinction shows that Miller was limited to the sentence at issue in that case, namely, mandatory LWOP, and- does not extend to lengthy aggregate sentences or life sentences with the possibility of parole. Id. I believe, however, that the quotation from Miller supports my interpretation: the Court made clear that a juvenile offender must, in any nonhomicide case, have the possibility of parole during his or her lifetime.
B. Application
¶51 To determine whether a juvenile offender’s sentence amounts to a de facto LWOP term, I would assess whether the sentence at issue denies the juvenile offender any meaningful opportunity for release within his or her life expectancy and whether the sentence fails to recognize that juveniles are more capable of change than are adults and thus their actions are less likely to result from an “irretrievably depraved character.” See Graham, 560 U.S. at 68, 130 S.Ct. 2011; Roper, 543 U.S. at 570, 125 S.Ct. 1183.
¶52 In practice, such an inquiry would require courts to determine whether the juvenile offender will be afforded a realistic opportunity to be paroled (as opposed to a guarantee of parole) within his or her life expectancy. A juvenile offender who would not be parole eligible until he or she was 200 years old would not have been afforded a realistic opportunity to be paroled within his or her life expectancy, and in my view, such a sentence would amount to a de facto LWOP sentence. See Graham, 560 U.S. at 79, 130 S.Ct. 2011 (“Terrance Graham’s sentence guai-antees he will die in prison without any meaningful opportunity to obtain release, no matter what he might do to demonstrate that the bad acts he committed as a teenager are not representative of his true character, even if he spends the next half century attempting to atone for his crimes and learn from his mistakes. The State has denied him any chance to later demonstrate that he is fit to rejoin society based solely on a nonhomicide crime that he committed while he was a child in the eyes of the law. This the Eighth Amendment does not permit.”).
¶53 Conversely, a juvenile offender who would be parole eligible at the age of thirty would likely be deemed to have been afforded a meaningful opportunity for parole in his or her lifetime, and such a sentence would not amount to a de facto LWOP sentence.
¶54 Applying these principles here, and assuming without deciding that attempted murder is, as Lucero contends, a nonhomi-cide crime, I would conclude that Lucero did not receive a de facto LWOP sentence. As the division below found, People v. Lucero, 2013 COA 53, ¶ 12, — P.3d —, and the record supports, Lucero will be eligible for parole at the age of fifty-seven, which is *1139 within his natural life expectancy. Accordingly, under Graham, 560 U.S. at 75, 130 S.Ct. 2011, the State has given Lucero “some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.” Therefore, on the record before us, Lucero has not established that he, in fact, received a de facto LWOP sentence in this case.
II. Conclusion
¶55 For these reasons, like the majority, I would affirm Lucero’s sentence, albeit on grounds different from those on which the majority relies. Accordingly, I respectfully concur in the judgment reached by the majority but not in its analysis of the issue presented.