IN THE COURT OF APPEALS OF NORTH CAROLINA

 No. COA19-530

 Filed: 6 October 2020

Cumberland County, No. 01 CRS 059934

STATE OF NORTH CAROLINA

 v.

JAMES RYAN KELLIHER, Defendant.

 Appeal by Defendant from judgments entered 13 December 2018 by Judge Carl

R. Fox in Cumberland County Superior Court. Heard in the Court of Appeals 18

February 2020.

 Attorney General Joshua H. Stein, by Assistant Attorney General Kimberly N.
 Callahan, for the State.

 Appellate Defender Glenn Gerding, by Assistant Appellate Defender Kathryn L.
 VandenBerg, for Defendant.

 McGEE, Chief Judge.

 James Ryan Kelliher (“Defendant”), following a troubled early life marked by

physical abuse and substance use, participated in a robbery at age 17 that ended with

the murders of a man and his pregnant girlfriend. Defendant was sentenced to two

consecutive mandatory punishments of life without parole (“LWOP”). Following the

United States Supreme Court’s decision in Miller v. Alabama, 567 U.S. 460, 183 L.

Ed. 2d 407 (2012), and the General Assembly’s enactment of N.C. Gen. Stat. § 15A-

1340.19A, et seq. in response, Defendant sought and received a resentencing hearing.
 STATE V. KELLIHER

 Opinion of the Court

At resentencing, the trial court determined that mitigating factors outweighed the

circumstances of the offenses, concluded Defendant was neither “incorrigible” nor

“irredeemable,” Graham v. Florida, 560 U.S. 48, 72, 75, 176 L. Ed. 2d 825, 844, 846

(2010), and resentenced him to two consecutive sentences of life with parole. Under

the terms of these sentences, Defendant will not be eligible for parole until he has

served 50 years in prison, placing his earliest possible release at age 67. Defendant

now appeals, arguing that the consecutive sentences constitute de facto LWOP in

violation of the Eighth Amendment and Article I, Section 27 of the North Carolina

Constitution. We agree with Defendant and reverse and remand for resentencing.

 I. FACTUAL AND PROCEDURAL HISTORY

A. Defendant’s Early Life

 Defendant was born in 1984 as the youngest of three siblings. Though he had

good relationships with his mother and older sisters, Defendant’s father physically

abused him during his childhood. Defendant began abusing substances at an early

age; he began drinking alcohol at age 13, was drinking daily and using marijuana at

age 15, and was under the continuous influence of some combination of alcohol,

marijuana, ecstasy, acid, psilocybin, and cocaine at age 17. Defendant attempted

suicide on three occasions: first by overdose at age 10, again at age 17 on the night

after the murders, and a final time while awaiting trial. He dropped out of school in

the ninth grade, and exhibited the equivalent of a sixth grade education at age 17.

 -2-
 STATE V. KELLIHER

 Opinion of the Court

 Defendant committed several thefts in his teenage years, breaking and

entering into vehicles and stores after they had closed. On one occasion, Defendant

stole from a video store with the help of someone named Jerome Branch. Defendant,

Mr. Branch, and Joshua Ballard would “hang out” together during this time, drinking

alcohol and doing drugs.

B. The Murders

 In the days before the murders involved in this appeal, Mr. Ballard suggested

to Defendant that they rob a cocaine and marijuana dealer named Eric Carpenter.

The two discussed the matter several times, with Mr. Ballard stating in later

conversations that he believed he would have to kill Mr. Carpenter in order to avoid

being identified as one of the perpetrators of the robbery. Defendant offered to give

a firearm he had previously stolen from a pawn shop to Mr. Ballard for this purpose.

They continued to plan the robbery over future phone calls, ultimately agreeing that

Defendant would serve as the driver while Mr. Ballard killed and robbed Mr.

Carpenter. Mr. Branch was later included in the planning, though he was never

given a defined role. Defendant also told his friend Liz Perry about the plans to rob

and murder Mr. Carpenter.

 Mr. Ballard arranged to purchase drugs from Mr. Carpenter behind a local

furniture store on 7 August 2001. On the night of the drug deal, Defendant drove Mr.

Ballard and Mr. Branch to the furniture store in Mr. Ballard’s truck. They met with

 -3-
 STATE V. KELLIHER

 Opinion of the Court

Mr. Carpenter when they arrived, but they spotted a marked police vehicle in the

parking lot and arranged with Mr. Carpenter to move the deal to his apartment.

Carpenter’s girlfriend, Kelsea Helton, also lived at the apartment, and was present

when the group reconvened in the apartment parking lot a short time later.

Following introductions, everyone went inside the apartment and began talking

civilly. Ms. Helton left the apartment briefly; when she returned,1 the conversation

turned to her pregnancy. What exactly occurred after that conversation is disputed;

what is certain, however, is that when it came time to carry out the robbery,

Defendant, Mr. Ballard, or both shot and killed Mr. Carpenter and Ms. Helton.

 Defendant, Mr. Branch, and Mr. Ballard met in the parking lot after the

shooting and split the drugs they had stolen from the apartment. The three met with

another group, which included Defendant’s friend, Ms. Perry, at a local park where

they drank cognac and smoked marijuana laced with cocaine. At some point during

the evening, Defendant told Ms. Perry about the robbery and murders. Defendant,

Mr. Ballard and Mr. Branch were later arrested for the murders.

C. Defendant’s Plea and Ballard’s Trials

 Defendant was indicted on two counts of first-degree murder, two counts of

robbery with a dangerous weapon, and one count of conspiracy to commit robbery

 1 Ms. Helton’s father, in his victim impact statement, said Ms. Helton left the apartment to
call her sister to finalize plans to vacate Mr. Carpenter’s apartment and move in with her sister later
that evening because Ms. Helton felt there were “some things that [were] happening [she] d[id]n’t
like.”

 -4-
 STATE V. KELLIHER

 Opinion of the Court

with a dangerous weapon by a grand jury on 25 March 2002. He pleaded guilty to all

charges in 2004 and was sentenced to two consecutive terms of LWOP for the murders

and concurrent terms of years for the robbery and conspiracy convictions.2 Mr.

Ballard was also charged with two counts of first-degree murder but pleaded not

guilty.

 Although his plea agreement did not require it, Defendant testified for the

State at Mr. Ballard’s trial,3 as did Ms. Perry and a friend of Mr. Ballard, Lisa

Boliaris. Defendant testified that he did not shoot either Mr. Carpenter or Ms. Helton,

instead stating that Mr. Ballard shot both victims. Ms. Perry offered a different

account, stating that Defendant had admitted to killing the couple on the night of the

murders. Ms. Boliaris gave yet another recollection of events, testifying that Mr.

Ballard told her he shot Mr. Carpenter while Defendant killed Ms. Helton.4

 Mr. Carpenter was convicted of the killings at the conclusion of his trial.

However, his convictions were set aside on appeal and Mr. Ballard was granted a new

trial. Ballard, 180 N.C. App. at 646, 638 S.E.2d at 481. Defendant again testified for

the State on retrial, but Mr. Ballard was ultimately acquitted. The district attorney

who secured Defendant’s plea and prosecuted both of Mr. Ballard’s trials later wrote

 2
 Defendant has since served the terms for robbery and conspiracy.
 3
 Mr. Branch pled guilty to accessory after the fact and was sentenced to a six-to-eight-year
term of imprisonment. He did not testify against Mr. Ballard.
 4 A more detailed rendition of this testimony is available in this Court’s opinion in State v.

Ballard, 180 N.C. App. 637, 638 S.E.2d 474 (2006).

 -5-
 STATE V. KELLIHER

 Opinion of the Court

a letter to Defendant’s counsel stating that he believed Defendant “testified truthfully

in both trials.”

D. Defendant’s Resentencing

 Defendant filed a motion for appropriate relief (“MAR”) in June 2013. In that

motion, Defendant asserted that: (1) the United States Supreme Court’s decision in

Miller rendered his LWOP sentences unconstitutional under the Eighth Amendment

to the United States Constitution and Article I, Section 27 of the North Carolina

Constitution; (2) resentencing was required under the recently enacted N.C. Gen.

Stat. § 15A-1340.19B;5 and (3) life with the possibility of parole was the appropriate

sentence. The MAR was denied by the trial court on the grounds that Miller and N.C.

Gen. Stat. § 15A-1340.19B did not apply retroactively. That order was subsequently

reversed by order of this Court, and Defendant received a resentencing hearing on 13

December 2018.

 At the resentencing hearing, Defendant and the State consented to a recitation

of the facts surrounding the murders consistent with the above history. The State

called the fathers of Mr. Carpenter and Ms. Helton to give victim impact statements.

Both testified to the indescribable hardship of losing a child—and future grandchild—

 5 Defendant’s MAR sought relief under subsection (a)(1) of the statute, which applies to
juvenile felony murder convictions. N.C. Gen. Stat. § 15A-1340.19B(a)(1) (2019). Defendant was
ultimately resentenced pursuant to subsection (a)(2), which applies to all other juvenile first-degree
murder convictions. N.C. Gen. Stat. § 15A-1340.19B(a)(2) (2019). Defendant did not argue the
applicability of subsection (a)(1) at resentencing, conceded that this was not a felony murder case
before the trial court, and does not raise the issue on appeal.

 -6-
 STATE V. KELLIHER

 Opinion of the Court

and the enduring impact on their families. Each expressed their love for their

children, their dismay at the loss of life, the sadness of lost opportunities to raise their

grandchild, and the lasting emotional trauma inflicted on their families. The State

rested its presentation following their testimony.

 Defendant presented the testimony of several witnesses in mitigation. A

clinical and forensic psychologist who had examined Defendant in January and

February of 2019 testified that Defendant suffered from post-traumatic stress

disorder as a result of the murders. He further reported that although Defendant

had a history of antisocial behavior, Defendant had ceased to exhibit those traits since

he had been imprisoned in 2004. The psychologist’s report detailed Defendant’s

childhood physical and drug abuse, his shortened education, and his efforts at self-

improvement while in prison. Specifically, the report disclosed that Defendant had

earned his GED and was pursuing a bachelor’s degree in ministry from Southeastern

Baptist Theological Seminary (“the Seminary”). Based on Defendant’s history,

current diagnoses, and efforts to better himself, the psychologist determined that

Defendant presented a low risk of future violence and was neither incorrigible nor

irredeemable. This low risk aligned with a separate assessment conducted by the

Department of Public Safety.

 Defendant offered additional testimony from the director of prison programs

at the Seminary. He testified that Defendant was accepted into the four-year

 -7-
 STATE V. KELLIHER

 Opinion of the Court

seminary program after a rigorous application process, describing him as an active

and very good student. Another witness from the Seminary testified that Defendant

assisted other students, was professional in his conduct, and sought to minister to

inmates outside the program who were struggling with incarceration. A pastor from

Redeemer Lutheran Church in Fayetteville also testified, stating he had visited with

Defendant every week since his arrest and had seen a remarkable change: “[T]oday

unfortunately [Defendant] makes me ashamed of my own spirituality. . . . [H]e is the

one who sometimes comforts me instead of vice versa. . . . He’s the one who has

consoled me. So, I enjoy immensely our visits because I think frankly I get more out

of it than he does.”

 Defendant also tendered documentary evidence in support of mitigation,

including his record of two nonviolent infractions while in prison and the assessments

of low risk completed by the Department of Public Safety and Defendant’s

psychologist. He concluded his presentation of evidence by colloquy, telling the trial

court that he knew he had “failed to do anything resembling the right thing” and

thought about the victims everyday with sorrow and regret. He stated that although

he knew he could never undo the pain caused, he sought to improve himself so that

he might help others “as harm reduction.” He concluded by telling the court he

“wish[ed] more than anything that [he] could somehow do something to change the

events from August 7, 2001.”

 -8-
 STATE V. KELLIHER

 Opinion of the Court

 In closing arguments, the State asked the trial court to sentence Defendant to

either LWOP, or to consecutive sentences of life with the possibility of parole as an

alternative. Defendant argued for concurrent sentences of life with the possibility of

parole, requesting that the Department of Correction have the opportunity to review

Defendant’s eligibility for parole at 25 years rather than 50 years. The trial court

then announced its order, which included thirteen findings in mitigation based on

Defendant’s troubled early life, his immaturity and drug addictions at the time of the

offenses, and the substantial evidence of rehabilitation. Based on these findings, the

trial court concluded that “[t]he mitigating factors and other factors and

circumstances present outweigh all the circumstances of the offense[,]” and

“Defendant is neither incorrigible nor irredeemable.” The trial court then sentenced

Defendant to two consecutive sentences of life with the possibility of parole.

Defendant appeals.

 II. ANALYSIS

 Defendant presents one principal argument on appeal: Defendant’s two

consecutive sentences, considered in the aggregate, constitute a disproportionate de

facto punishment of LWOP in violation of the Eighth Amendment to the United

States Constitution and Article I, Section 27 of the North Carolina Constitution.

More specifically, he contends that because he is a juvenile defendant and is neither

incorrigible nor irredeemable, this de facto LWOP sentence violates Miller and

 -9-
 STATE V. KELLIHER

 Opinion of the Court

related United States Supreme Court precedents, as determined by several state and

federal courts that have considered the question. The State, in response, contends

that Defendant failed to preserve this issue and, in the alternative, asks us to follow

a different line of state and federal decisions that have rejected arguments similar to

Defendant’s. We first address the State’s preservation argument before reaching the

merits of Defendant’s appeal.

A. Preservation

 Our Supreme Court has made clear that the North Carolina Rules of Appellate

Procedure require constitutional sentencing errors be raised before the trial court in

order to be preserved for appellate review. State v. Meadows, 371 N.C. 742, 749, 821

S.E.2d 402, 407 (2018). However, a party is only required to “stat[e] the specific

grounds for the ruling the party desired the court to make if the specific grounds were

not apparent from the context[,]” N.C. R. App. P. 10(a)(1) (2020) (emphasis added),

and our Supreme Court has held constitutional arguments “implicitly presented to

the trial court” are preserved for review. State v. Murphy, 342 N.C. 813, 822, 467

S.E.2d 428, 433 (1996). Defendant insists that his argument was preserved on appeal

under these precedents because: (1) his MAR sought a sentence that comported with

the Eighth Amendment, Miller, and the North Carolina Constitution; and (2) his

counsel argued for concurrent sentences based on Miller at the resentencing hearing.

Reviewing the transcript from the resentencing hearing, Defendant’s counsel did

 - 10 -
 STATE V. KELLIHER

 Opinion of the Court

argue that concurrent sentences were appropriate, given the alternative would

prohibit parole for 50 years:

 I would just say this as far as the punishment is concerned.
 I’m 68, if you sentence me to 50 years, I’ll do the best I can
 but I’m going to leave most of that time on the floor. If you
 sentence me to 25, I may make it.

 If you sentence a 17-year old to 25 years, he’ll do 100
 percent of that sentence probably. But at the end of 25
 years if he’s serving consecutive sentences, he doesn’t get
 out.

 ....

 And then at some point possibly he’ll be paper paroled6
 from the first one and get to serve a minimum of 25 more
 years before he’s reviewed again and then every two years.

 ....

 Now he’s going to be in prison for a while. He’s only done
 17 years. But we’re asking the Court to put it in the hands
 of Department of Corrections [sic] to let them review him
 as they have scrutinized his life for 17 years and sentence
 him to life with parole and run the sentences concurrently.

Construed together with his MAR, we hold that Defendant has, at a minimum, raised

an implied argument that two concurrent sentences of life—with the possibility of

 6 We note that the practice of issuing “paper parole” is no longer permitted under North
Carolina law. See Robbins v. Freeman, 127 N.C. App. 162, 165, 487 S.E.2d 771, 773 (1997) (“[W]e can
find no statutory authority for [the Department of Correction’s and Parole Commission’s] practice of
issuing ‘paper paroles.’ ”), aff’d per curiam, 347 N.C. 664, 496 S.E.2d 375 (1998). We thus understand
counsel’s argument as asserting that parole is not available under two consecutive sentences for life
with the possibility parole until 50 years into a defendant’s sentence. Both Defendant and the State
agree on appeal that Defendant must serve 50 years before being eligible for parole under the
consecutive sentences imposed in this case.

 - 11 -
 STATE V. KELLIHER

 Opinion of the Court

parole after 25 years, as opposed to 50 years—are proportional punishment under the

Eighth Amendment, Miller, and the North Carolina Constitution. Defendant has

therefore preserved his constitutional argument for review.

 Although we hold Defendant has preserved his argument, we note that he has

requested this Court use its discretion to invoke Rule 2 of the North Carolina Rules

of Appellate Procedure and set aside the requirements of Rule 10. See N.C. R. App.

P. 2 (2020) (“To prevent manifest injustice to a party, or to expedite decision in the

public interest, either court of the appellate division may, except as otherwise

expressly provided by these rules, suspend or vary the requirements of any of these

rules in a case pending before it[.]”). Assuming arguendo that Defendant’s

constitutional question was not preserved under Rule 10, a discretionary

implementation of Rule 2 is warranted under the circumstances. Our Supreme Court

has employed the Rule “on several occasions to review issues of constitutional

importance.” State v. Mobley, 200 N.C. App. 570, 573, 684 S.E.2d 508, 510 (2009)

(first citing State v. Dudley, 319 N.C. 656, 356 S.E.2d 361 (1987); and then citing State

v. Wiley, 355 N.C. 592, 565 S.E.2d 22 (2002)). Given that multiple state appellate

 - 12 -
 STATE V. KELLIHER

 Opinion of the Court

courts7 and federal courts of appeal8 have addressed the constitutional issues

presented here—and there are at least four other similar cases presently pending

before this Court9—Defendant’s appeal is certainly of “constitutional importance.”

Mobley, 200 N.C. App. at 573, 684 S.E.2d at 510 (citations omitted). Furthermore,

the State’s alleged violation of the United States Constitution in resentencing

implicates a substantial right supporting application of Rule 2. See State v. Bursell,

372 N.C. 196, 201, 827 S.E.2d 302, 306 (2019) (affirming this Court’s discretionary

invocation of Rule 2 where the trial court “committed error relating to a substantial

right,” namely the right to be free from unreasonable searches and seizures under

the Fourth Amendment). Our Supreme Court has invoked Rule 2 “more frequently

in the criminal context when severe punishments were imposed[,]” lending further

support to its application here. State v. Hart, 361 N.C. 309, 316, 644 S.E.2d 201, 205

 7 See Pedroza v. State, 291 So.3d 541 (Fla. 2020); State v. Slocumb, 827 S.E.2d 148 (S.C. 2019);
Carter v. State, 192 A.3d 695 (Md. 2018); Veal v. State, 810 S.E.2d 127 (Ga.), cert. denied, ____ U.S.
____, 139 S. Ct. 320, 202 L. Ed. 2d 218 (2018); Ira v. Janecka, 419 P.3d 161 (N.M. 2018); Kinkel v.
Persson, 417 P.3d 401 (Or. 2018), cert. denied, ____ U.S. ____, 139 S. Ct. 789, 202 L. Ed. 2d 585 (2019);
Lucero v. People, 394 P.3d 1128 (Colo. 2017), cert. denied, ____ U.S. ____, 138 S. Ct. 641, 199 L. Ed. 2d
544 (2018); State v. Ali, 895 N.W.2d 237 (Minn. 2017), cert. denied, ____ U.S. ____, 138 S. Ct. 640, 199
L. Ed. 2d 543 (2018); State ex. rel Carr v. Wallace, 527 S.W.3d 55 (Mo. 2017); Steilman v. Michael, 407
P.3d 313 (Mont. 2017); State v. Zuber, 152 A.3d 197, (N.J. 2017); State v. Ramos, 387 P.3d 650 (Wash.
2017) (en banc); People v. Reyes, 63 N.E.3d 884 (Ill. 2016); State ex rel. Morgan v. State, 217 So.3d 266
(La. 2016); State v. Moore, 76 N.E.3d 1127 (Ohio 2016); Vasquez v. Commonwealth, 781 S.E.2d 920
(Va. 2016); Casiano v. Comm'r of Corr., 115 A.3d 1031 (Conn. 2015); State v. Boston, 363 P.3d 453
(Nev. 2015); Bear Cloud v. State, 334 P.3d 132 (Wyo. 2014); State v. Ragland, 836 N.W.2d 107 (Iowa
2013); People v. Caballero, 282 P.3d 291 (Cal. 2012).
 8 See United States v. Grant, 887 F.3d 131, reh’g en banc granted, opinion vacated, 905 F.3d

285 (3rd Cir. 2018); Kelly v. Brown, 851 F.3d 686 (7th Cir. 2017); Moore v. Biter, 725 F.3d 1184 (9th
Cir. 2013); Budder v. Addison, 851 F.3d 1047 (10th Cir.); Bunch v. Smith, 685 F.3d 546 (6th Cir. 2012).
 9 See State v. Anderson, No. COA19-841; State v. Slade, No. COA19-969; State v. Conner, No.

COA19-1087; State v. Brimmer, No. COA19-1103.

 - 13 -
 STATE V. KELLIHER

 Opinion of the Court

(2007) (first citing State v. Moore, 335 N.C. 567, 612, 440 S.E.2d 797, 823 (1994); then

citing State v. Booher, 305 N.C. 554, 564, 290 S.E.2d 561, 566 (1982); then citing State

v. Poplin, 304 N.C. 185, 186-87, 282 S.E.2d 420, 421 (1981); and then citing State v.

Adams, 298 N.C. 802, 804, 260 S.E.2d 431, 432 (1979)). We therefore conclude that,

even if Defendant failed to preserve his constitutional argument through valid

objection under Rule 10, review of his appeal is appropriate pursuant to Rule 2.

B. The Eighth Amendment and Juveniles

 Resolution of this appeal requires consideration of the Eighth Amendment as

applied to juveniles under four decisions of the Supreme Court of the United States:

Roper v. Simmons, 543 U.S. 551, 161 L. Ed. 2d 1 (2005), Graham v. Florida, 560 U.S.

48, 176 L. Ed. 2d 825 (2010), Miller v. Alabama, 567 U.S. 460, 183 L. Ed. 2d 407

(2012), and Montgomery v. Louisiana, ____ U.S. ____, 193 L. Ed. 2d 599 (2016).

 1. Roper Prohibits Execution of Juveniles

 In the first of these cases, the Supreme Court considered “whether it is

permissible under the Eighth and Fourteenth Amendments . . . to execute a juvenile

offender who was older than 15 but younger than 18 when he committed a capital

crime.” Roper, 543 U.S. at 555-56, 161 L. Ed. 2d at 13. It examined the question first

by conducting “a review of objective indicia of consensus, as expressed in particular

by the enactments of legislatures that have addressed the question[,]” before

“determinin[ing], in the exercise of our own independent judgment, whether the

 - 14 -
 STATE V. KELLIHER

 Opinion of the Court

death penalty is a disproportionate punishment for juveniles.” Id. at 564, 193 L. Ed.

2d at 18. The Supreme Court ultimately answered the question in the affirmative,

issuing a categorical holding that “the Eighth and Fourteenth Amendments forbid

imposition of the death penalty on offenders who were under the age of 18 when their

crimes were committed.” Id. at 578, 161 L. Ed. 2d at 28.

 In conducting the first step of its two-pronged examination, the Supreme Court

observed that, in the years leading up to the case, there was a “significant” and

“consistent” trend away from the execution of juveniles amongst the States, id. at

565-66, 161 L. Ed. 2d at 19-20, leading to the conclusion that “[a] majority of States

have rejected the imposition of the death penalty on juvenile offenders under 18[.]”

Id. at 568, 161 L. Ed. 2d at 21. It then turned to the second step: whether the Eighth

Amendment compelled a categorical prohibition against the execution of juveniles.

Id. The majority found the answer by recognizing that “the death penalty is reserved

for a narrow category of crimes and offenders[,]” id. at 568-69, 161 L. Ed. 2d at 21,

and then discerning that, because of their unique developmental characteristics,

“juvenile offenders cannot with reliability be classified among the worst offenders.”

Id. at 569, 161 L. Ed. 2d at 21. Once these precepts were established, the Supreme

Court concluded that “the penological justifications for the death penalty apply to

them with lesser force than to adults[,]” id. at 571, 161 L. Ed. 2d. at 23, meaning that

“[w]hen a juvenile offender commits a heinous crime, the State can exact forfeiture of

 - 15 -
 STATE V. KELLIHER

 Opinion of the Court

some of the most basic liberties, but the State cannot extinguish his life and his

potential to attain a mature understanding of his own humanity.” Id. at 573-74, 161

L. Ed. 2d at 24.

 Roper makes clear that its logic is grounded in the fundamental recognition

that juveniles are of a special character for the purposes of the Eighth Amendment.

In examining juveniles as a class of criminal offenders, the Supreme Court observed

that “[t]hree general differences between juveniles under 18 and adults demonstrate

that juvenile offenders cannot with reliability be classified among the worst

offenders.” Id. at 570, 161 L. Ed. 2d at 21. Compared to adults, juveniles possess

“ ‘[a] lack of maturity and an underdeveloped sense of responsibility . . . . These

qualities often result in impetuous and ill-considered actions and decisions.’ ” Id.

(alteration in original) (quoting Johnson v. Texas, 509 U.S. 350, 367, 125 L. Ed. 2d

290, 306 (1993)) (additional citation omitted). Such immaturity “means ‘their

irresponsible conduct is not as morally reprehensible as that of an adult.’ ” Id. at 570,

161 L. Ed. 2d at 22 (quoting Thompson v. Oklahoma, 487 U.S. 815, 835, 101 L. Ed.

2d 702, 719 (1988) (plurality opinion)). Juveniles are likewise “more vulnerable or

susceptible to negative influences and outside pressures, including peer

pressure. . . . [J]uveniles have less control, or less experience with control, over their

own environment,” id. at 569, 161 L. Ed. 2d at 22 (citations omitted), providing them

“a greater claim than adults to be forgiven for failing to escape negative influences in

 - 16 -
 STATE V. KELLIHER

 Opinion of the Court

their whole environment.” Id. at 570, 161 L. Ed. 2d at 22 (citation omitted). Lastly,

“the character of a juvenile is not as well formed as that of an adult. The personality

traits of juveniles are more transitory, less fixed.” Id. (citation omitted). “From a

moral standpoint it would be misguided to equate the failings of a minor with those

of an adult, for a greater possibility exists that a minor’s character deficiencies will

be reformed.” Id. This is no less true of juveniles guilty of “a heinous crime.” Id. On

the whole, juveniles are thus of “diminished culpability[.]” Id. at 571, 161 L. Ed. 2d

at 23.

 These unique qualities and resultant lesser culpability undercut the

penological justifications behind the death penalty. Id. Death as retribution is

disproportionate:

 Whether viewed as an attempt to express the community’s
 moral outrage or as an attempt to right the balance for the
 wrong to the victim, the case for retribution is not as strong
 with a minor as with an adult. Retribution is not
 proportional if the law’s most severe penalty is imposed on
 one whose culpability or blameworthiness is diminished, to
 a substantial degree, by reason of youth and immaturity.

Id. Deterrence does not even the scales:

 [I]t is unclear whether the death penalty has a significant
 or even measurable deterrent effect on juveniles . . . . [T]he
 absence of evidence of deterrent effect is of special concern
 because the same characteristics that render juveniles less
 culpable than adults suggest as well that juveniles will be
 less susceptible to deterrence. . . . To the extent the
 juvenile death penalty might have residual deterrent
 effect, it is worth noting that the punishment of life

 - 17 -
 STATE V. KELLIHER

 Opinion of the Court

 imprisonment without the possibility of parole is itself a
 severe sanction, in particular for a young person.

Id. at 571-72, 161 L. Ed. 2d at 23. The Supreme Court would later examine exactly

when the “severe sanction” of LWOP may be imposed on juveniles in Graham.

 2. Graham Prohibits LWOP for Juveniles in Non-Homicide Cases

 In Graham, the Supreme Court extended the categorical rationale in Roper to

hold that juveniles may not be sentenced to LWOP for non-homicide offenses under

the Eighth Amendment. 560 U.S. at 61-62, 74, 176 L. Ed. 2d at 837, 845. Taking the

same two-pronged approach, the majority first determined that, in light of actual

sentencing practices rather than strict consideration of legislative prohibitions, “life

without parole sentences for juveniles convicted of nonhomicide crimes is as rare as

other sentencing practices found to be cruel and unusual.” Id. at 66, 176 L. Ed. 2d at

840. Thus, though the practice was permitted in many states, it was nonetheless

“exceedingly rare. And ‘it is fair to say that a national consensus has developed

against it.’ ” Id. at 67, 176 L. Ed. 2d. at 841 (quoting Atkins v. Virginia, 536 U.S. 304,

316, 153 L. Ed. 2d 335, 347 (2002)).

 At the second step, the Graham Court took Roper’s observations about

juveniles as foundational precepts:

 Roper established that because juveniles have lessened
 culpability they are less deserving of the most severe
 punishments. 543 U.S., at 569. As compared to adults,
 juveniles have a “ ‘lack of maturity and an underdeveloped
 sense of responsibility’ ”; they “are more vulnerable or

 - 18 -
 STATE V. KELLIHER

 Opinion of the Court

 susceptible to negative influences and outside pressures,
 including peer pressure”; and their characters are “not as
 well formed.” Id., at 569–570. These salient
 characteristics mean that “[i]t is difficult even for expert
 psychologists to differentiate between the juvenile offender
 whose crime reflects unfortunate yet transient immaturity,
 and the rare juvenile offender whose crime reflects
 irreparable corruption.” Id., at 573. Accordingly, “juvenile
 offenders cannot with reliability be classified among the
 worst offenders.” Id., at 569. A juvenile is not absolved of
 responsibility for his actions, but his transgression “is not
 as morally reprehensible as that of an adult.” Thompson,
 supra, at 835 (plurality opinion).

Id. at 68, 176 L. Ed. 2d at 841. The Supreme Court then deemed it “relevant to

consider next the nature of the offenses to which this harsh penalty [of LWOP] might

apply[,]” id. at 68-69, 176 L. Ed. 2d at 842, and determined that not only are juveniles

fundamentally less culpable, but, “when compared to an adult murderer, a juvenile

offender who did not kill or intend to kill has a twice diminished moral culpability.

The age of the offender and the nature of the crime each bear on the analysis.” Id. at

69, 176 L. Ed. 2d at 842.

 The Supreme Court turned next to the nature of the punishment. “[L]ife

without parole is the second most severe penalty permitted by law.” Id. (citation and

quotation marks omitted). LWOP sentences thus:

 share some characteristics with death sentences that are
 shared by no other sentences. . . . [T]he sentence alters the
 offender’s life by a forfeiture that is irrevocable. It deprives
 the convict of the most basic liberties without giving hope
 of restoration[.] . . . [T]his sentence means denial of hope;
 it means that good behavior and character improvement

 - 19 -
 STATE V. KELLIHER

 Opinion of the Court

 are immaterial; it means that whatever the future might
 hold in store for the mind and spirit . . . he will remain in
 prison for the rest of his days.

Id. at 69-70, 176 L. Ed. 2d at 842 (citation and quotation marks omitted). Such

lifelong permanence “is . . . especially harsh . . . for a juvenile. . . . A 16-year-old and

a 75-year-old each sentenced to life without parole receive the same punishment in

name only. This reality cannot be ignored.” Id. at 70-71, 176 L. Ed. 2d at 843

(citations omitted).

 As a final consideration, the Supreme Court examined the penological

underpinnings as applied to non-homicide juvenile defendants. In rejecting

retribution and deterrence as valid objectives, id. at 71-72, 176 L. Ed. 2d. at 843-44,

the majority relied extensively on Roper, reiterating that juveniles’ unique qualities

render them less culpable and “less likely to take a possible punishment into

consideration when making decisions.” Id. at 72, 176 L. Ed. 2d at 844. Incapacitation,

too, was an inadequate justification for related reasons; juveniles are malleable, yet

“[t]o justify life without parole on the assumption that the juvenile offender forever

will be a danger to society requires the sentencer to make a judgment that the

juvenile is incorrigible. . . . [I]ncorrigibility is inconsistent with youth. . . . [LWOP]

improperly denies the juvenile offender a chance to demonstrate growth and

maturity.” Id. at 72-73, 176 L. Ed. 2d at 844-45 (citation and quotation marks

omitted). The Supreme Court further held rehabilitation, a fourth penological

 - 20 -
 STATE V. KELLIHER

 Opinion of the Court

objective, is entirely irreconcilable with LWOP sentences. Id. at 74, 176 L. Ed. 2d at

845.

 Absent any adequate penological theory, and in light of “the limited culpability

of juvenile homicide offenders; and the severity of life without parole sentences[,]” the

Supreme Court concluded that a categorical bar akin to Roper was required by the

Eighth Amendment. Id. It further stressed that “[a] State is not required to

guarantee eventual freedom to a juvenile offender convicted of a nonhomicide crime.

What the State must do, however, is give [such] defendants . . . some meaningful

opportunity to obtain release based on demonstrated maturity and rehabilitation.”

Id. at 75, 176 L. Ed. 2d at 845-46.

 3. Miller Prohibits Mandatory LWOP for Juvenile Homicide
 Defendants

 The Supreme Court, relying on Roper and Graham, held in Miller that

mandatory LWOP for a juvenile defendant convicted of homicide crimes is a

disproportionate punishment under the Eighth Amendment. 567 U.S. at 465, 183 L.

Ed. 2d at 414-15. Its ruling was derived from “two strands of precedent reflecting our

concern with proportionate punishment.” Id. at 470, 183 L. Ed. 2d at 417. The first,

which included Roper and Graham, announced categorical prohibitions against

certain sentences “based on mismatches between the culpability of a class of offenders

and the severity of a penalty.” Id. (citation omitted). The second line “prohibited

mandatory imposition of capital punishment, requiring that sentencing authorities

 - 21 -
 STATE V. KELLIHER

 Opinion of the Court

consider the characteristics of a defendant and the details of his offense before

sentencing him to death.” Id. at 470, 183 L. Ed. 2d at 418 (citations omitted). Taken

together, “these two lines of precedent lead[] to the conclusion that mandatory life-

without-parole sentences for juveniles violate the Eighth Amendment.” Id.

 The Court’s analysis in Miller began with Roper and Graham, which “establish

that children are constitutionally different from adults for purposes of sentencing.”

Id. at 471, 183 L. Ed. 2d at 418. Reiterating the three differences between adult and

juvenile defendants identified in those two cases—immaturity, vulnerability to

influence and lack of control, and malleability—as observations based “on common

sense . . . [and] science and social science[,]” id. at 471, 183 L. Ed. 2d at 418-19, the

Court again acknowledged that “those findings . . . both lessened a child’s moral

culpability and enhanced the prospect that, as the years go by and neurological

development occurs, his deficiencies will be reformed.” Id. at 472, 183 L. Ed. 2d at

419 (citations and quotation marks omitted). It once more stated that “the distinctive

attributes of youth diminish the penological justifications for imposing the harshest

sentences on juvenile offenders, even when they commit terrible crimes.” Id. Also,

though it acknowledged Graham’s categorical holding applied only to non-homicide

offenses, the Supreme Court clarified that “none of what [Graham] said about

children—about their distinctive (and transitory) mental traits and environmental

vulnerabilities—is crime-specific. . . . So Graham’s reasoning implicates any life-

 - 22 -
 STATE V. KELLIHER

 Opinion of the Court

without-parole sentence imposed on a juvenile, even as its categorical bar relates only

to nonhomicide offenses.” Id. at 473, 183 L. Ed. 2d at 420.

 In considering the penalty itself, Miller pulled a flat parallel out of Graham:

the “ ‘[t]reat[ment] [of] juvenile life sentences as analogous to capital punishment.’ ”

Id. at 475, 183 L. Ed. 2d at 421 (alteration in original) (quoting Graham, 560 U.S. at

89, 176 L. Ed. 2d at 856 (Roberts, C.J., concurring in the judgment)). The Supreme

Court thus turned to its line of death penalty cases, which require individualized

sentencing “so that the death penalty is reserved only for the most culpable

defendants committing the most serious offenses.” Id. at 475-76, 183 L. Ed. 2d at 421

(citations omitted). When that line is considered “[i]n light of Graham’s reasoning,

th[o]se decisions too show the flaws of imposing mandatory life-without-parole

sentences on juvenile homicide offenders.” Id. at 476, 183 L. Ed. 2d at 422.

Mandatory LWOP sentences for juvenile homicide offenders thus ran afoul of both

lines as disproportionate even though such sentences did not fit squarely within their

express holdings. Id. at 479, 183 L. Ed. 2d at 424.

 4. Montgomery: Miller Is Substantive Rule of Retroactive Effect

 The core question in Montgomery was whether Miller’s holding announced a

substantive rule of retroactive effect. ___ U.S. at ___, 193 L. Ed. 2d at 610. In

concluding that it did, the Supreme Court clarified the applicability of Roper,

Graham, and Miller in several ways pertinent to this appeal. First, it explained “[t]he

 - 23 -
 STATE V. KELLIHER

 Opinion of the Court

‘foundation stone’ for Miller’s analysis was this Court’s line of precedent holding

certain punishments disproportionate when applied to juveniles. Those cases include

Graham . . . and Roper.” Montgomery, ___ U.S. at ___, 193 L. ed. 2d at 618 (citations

omitted). Second, and of particular importance to this appeal, it explained that Miller

announced a categorical prohibition against LWOP sentences for juvenile homicide

defendants who are not “irreparably corrupt”:

 Miller . . . did more than require a sentencer to consider a
 juvenile offender's youth before imposing life without
 parole; it established that the penological justifications for
 life without parole collapse in light of “the distinctive
 attributes of youth.” Id., [567 U.S. at 472], 132 S. Ct. 2455,
 2465, 183 L. Ed. 2d 407, 419. Even if a court considers a
 child's age before sentencing him or her to a lifetime in
 prison, that sentence still violates the Eighth Amendment
 for a child whose crime reflects “ ‘unfortunate yet transient
 immaturity.’ ” Id., at [479], 132 S. Ct. 2455, 2469, 183 L.
 Ed. 2d 407, 424 (quoting Roper, 543 U.S., at 573, 125 S. Ct.
 1183, 161 L. Ed. 2d 1). Because Miller determined that
 sentencing a child to life without parole is excessive for all
 but “ ‘the rare juvenile offender whose crime reflects
 irreparable corruption,’ ” 567 U.S., at [479-80], 132 S. Ct.
 2455, 2469, 183 L. Ed. 2d 407, 424 (quoting Roper, supra,
 at 573, 126 S. Ct. 1183, 161 L. Ed. 2d 1), it rendered life
 without parole an unconstitutional penalty for “a class of
 defendants because of their status”—that is, juvenile
 offenders whose crimes reflect the transient immaturity of
 youth. Penry, 492 U.S., at 330, 109 S. Ct. 2934, 106 L. Ed.
 2d 256. As a result, Miller announced a substantive rule of
 constitutional law.

Id. at ___, 193 L. Ed. 2d at 619-20. Thus, Montgomery, as a distillation of Roper,

Graham, and Miller, made clear that juvenile homicide offenders who are neither

 - 24 -
 STATE V. KELLIHER

 Opinion of the Court

incorrigible nor irreparably corrupt, are—like other juvenile offenders—so distinct in

their immaturity, vulnerability, and malleability as to be outside the realm of LWOP

sentences under the Eighth Amendment.

C. Defendant’s Sentence and De Facto LWOP

 Defendant’s argument asks us to apply the above principle from Miller, derived

from Roper and Graham and plainly stated in Montgomery, to hold that Defendant’s

consecutive sentences of life with parole constitute a de facto LWOP sentence in

violation of those precedents and the Eighth Amendment and Article I, Section 27 of

the North Carolina Constitution.10 Specifically, he contends that because he will not

be eligible for parole until age 67, he will not be afforded a “meaningful opportunity

to obtain release based on demonstrated maturity and rehabilitation,” Graham, 569

U.S. at 75, 176 L. Ed. 2d. at 846, and will suffer “no chance for fulfillment outside

prison walls, no chance for reconciliation with society, no hope.” Id. at 79, 176 L. Ed.

2d at 848. See also Miller, 567 U.S. at 479, 183 L. Ed. 2d at 424 (quoting the first

excerpt from Graham). His ultimate argument thus consists of three constituent

questions that do not appear to have been answered by the courts of this State and

have caused concern in other jurisdictions: (1) are de facto LWOP sentences, as

opposed to sentences expressly named as such, cognizable and barred as cruel and

 10 Our Supreme Court “historically has analyzed cruel and/or unusual punishment claims by
criminal defendants the same under both the federal and state Constitutions.” State v. Green, 348
N.C. 588, 603, 502 S.E.2d 819, 828 (1998). Our analysis therefore applies equally to both.

 - 25 -
 STATE V. KELLIHER

 Opinion of the Court

unusual when applied to redeemable juveniles under the Eighth Amendment; (2) can

aggregated punishments, i.e. multiple consecutive sentences totaling a lengthy term

of years, amount to a de facto LWOP sentence; and (3) must a de facto LWOP

punishment obviously exceed a juvenile defendant’s natural life, or does some term

of years that may (or may not) fall short of the juvenile’s full lifespan nonetheless

constitute an impermissible de facto LWOP sentence?

 1. De Facto LWOP Sentences

 The question of whether de facto LWOP sentences are cognizable as a cruel

and unusual punishment barred under Graham and Miller has been answered by a

sizeable number of state appellate courts. Of those identified by this Court as having

addressed the issue, these jurisdictions predictably fall into two camps: (1) those that

recognize de facto LWOP sentences as cognizable and may warrant relief under the

 - 26 -
 STATE V. KELLIHER

 Opinion of the Court

Eighth Amendment;11 and (2) those that have thus far decided not to do so.12 A clear

majority of these states count themselves among the former.13 We see considerable

reason to join the majority.

 11 See People v. Caballero, 282 P.3d 291, 295 (Cal. 2012) (holding consecutive sentences totaling
110-years-to-life was de facto LWOP sentence under Graham); State v. Ragland, 836 N.W.2d 107, 121-
22 (Iowa 2013) (holding a life sentence with parole eligibility after 60 years was a de facto LWOP
sentence in violation of Miller); Bear Cloud v. State, 334 P.3d 132, 141-42 (Wyo. 2014) (holding
consecutive sentences, including a life sentence for homicide, with parole eligibility after 45 years was
de facto LWOP controlled by Miller); Casiano v. Comm'r of Corr., 115 A.3d 1031, 1047-48 (Conn. 2015)
(holding a juvenile’s 50 year sentence without possibility of parole was a de facto LWOP sentence
controlled by Miller); Henry v. State, 175 So.3d 675, 679-80 (Fla. 2015) (holding 90 year sentence for
non-homicide juvenile defendant was unconstitutional under Graham); State v. Boston, 363 P.3d 453,
458 (Nev. 2015) (holding aggregate sentences for non-homicide offenses placing parole eligibility at
100 years are a de facto LWOP sentence in violation of Graham); People v. Reyes, 63 N.E.3d 884, 888
(Ill. 2016) (holding mandatory 97 year sentence with parole eligibility after 89 years is de facto LWOP
and unconstitutional under Miller); State ex rel. Morgan v. State, 217 So.3d 266, 271 (La. 2016) (“We .
. . construe the defendant’s 99-year sentence as an effective life sentence, illegal under Graham.”);
State v. Moore, 76 N.E.3d 1127, 1140-41 (Ohio 2016) (holding consecutive terms-of-years sentences for
non-homicide crimes with parole eligibility after 77 years is an unconstitutional de facto LWOP
sentence under Graham); State ex. rel Carr v. Wallace, 527 S.W.3d 55, 63-64 (Mo. 2017) (holding
mandatory concurrent sentences with parole eligibility after 50 years constituted a de facto LWOP
sentence subject to Miller’s sentencing requirements); Steilman v. Michael, 407 P.3d 313, 319 (Mont.
2017) (holding de facto LWOP sentences are subject to constitutional protections of Graham, Miller,
and Montgomery); State v. Zuber, 152 A.3d 197, 212 (N.J. 2017) (holding “lengthy term-of-years
sentences that amount to life without parole” are controlled by Graham and Miller); State v. Ramos,
387 P.3d 650, 659 (Wash. 2017) (en banc) (“We now join the majority of jurisdictions that have
considered the question and hold that Miller does apply to juvenile homicide offenders facing de facto
life-without-parole sentences.”); Commonwealth v. Foust, 180 A.3d 416, 431 (Pa. 2018) (holding a term-
of-years sentence constituting a de facto LWOP sentence requires sentencing protections of Miller);
Carter v. State, 192 A.3d 695, 735 (Md. 2018) (100-year aggregate punishment for non-homicide crimes
with parole eligibility after 50 years was de facto LWOP sentence in violation of Graham); Ira v.
Janecka, 419 P.3d 161, 167 (N.M. 2018) (holding Roper, Graham, and Miller applied to term-of-years
sentences); White v. Premo, 443 P.3d 597, 604-05 (Or. 2019) (holding juvenile’s 800-month sentence for
murder with parole eligibility at 54 years was de facto LWOP sentence subject to Miller protections).
 12 Several state courts appear to have held that de facto LWOP sentences are not cognizable

under any circumstances. See State v. Kasic, 265 P.3d 410, 414 (Ariz. Ct. App. 2011) (holding Graham
inapplicable to term-of-years sentences); Hobbs v. Turner, 431 S.W.3d 283, 289 (Ark. 2014) (holding
Graham and Miller do not apply to a “nonlife sentence”); Lucero v. People, 394 P.3d 1128, 1130 (Colo.
2017) (refusing to recognize de facto LWOP sentences in part because “[l]ife without parole is a specific
sentence”); Veal v. State, 810 S.E.2d 127, 129 (Ga. 2018) (refusing to apply Miller and Montgomery to
any sentences “other than LWOP”). Another state court appears to have ignored the argument
outright. See Diamond v. State, 419 S.W.3d 435, 441 (Tex. Ct. App. 2012) (upholding a 99-year

 - 27 -
 STATE V. KELLIHER

 Opinion of the Court

 We, like many states in that majority, decline to stand behind the simple

formalism that a sufficiently lengthy term-of-years sentence cannot be a sentence of

LWOP because it does not bear the name and terminates at a date certain. Rejection

of the proposition is, first, a simple “matter of common sense . . . . Otherwise, the

Eighth Amendment proscription against cruel and unusual punishment in the

context of a juvenile offender could be circumvented simply by stating the sentence

in numerical terms that exceed any reasonable life expectancy rather than labeling

it a ‘life’ sentence.” Carter, 192 A.3d at 725. As was noted in Miller, “[t]he Eighth

sentence imposed on a juvenile without discussing Graham despite counsel’s argument raising the
issue). At least two states seem to have suggested de facto LWOP sentences may exist but have yet to
hold as such. See State v. Quevedo, 947 N.W.2d 402, ___ (S.D. 2020) (“[O]ur cases have seemed to
suggest that a juvenile sentence involving a lengthy term of years and the lack of a meaningful
opportunity for release could constitute a de facto life sentence and transgress Graham’s categorical
Eighth Amendment prohibition on life without parole[.]” (citations omitted)); Mason v. State, 235
So.3d 129, 134 (Miss. 2017) (suggesting the defendant may have shown a de facto life sentence in
violation of Miller and Montgomery had he presented evidence in support, but failure to do so and
concession that his life expectancy would extend beyond parole eligibility defeated claim). Another
grouping of states has elected not to afford relief under a de facto LWOP theory by declining to answer
whether aggregated sentences and/or term-of-years sentences violate the Eighth Amendment absent
a Supreme Court decision to that express effect. See State v. Ali, 895 N.W.2d 237, 246 (Minn. 2017)
(declining to recognize aggregated term-of-years sentences as de facto LWOP sentences “absent further
guidance from the [Supreme] Court” on both aggregation and recognition of de facto LWOP); State v.
Slocumb, 827 S.E.2d 148, 152 (S.C. 2019) (recognizing that de facto LWOP punishments, whether as
a single sentence or aggregated punishment, exist and may violate Graham and Miller, but declining
to so hold “without further input from the Supreme Court”). Still another category has held that
aggregated sentences cannot constitute a de facto LWOP sentence and resolved the defendants’
appeals on that ground without affirmatively stating whether de facto LWOP sentences are otherwise
cognizable. See Martinez v. State, 442 P.3d 154, 156-57 (Okla. Crim. App. 2019) (holding Graham,
Miller, and Montgomery do not apply to aggregated sentences and concluding, without any discussion,
that parole eligibility at age 79 offers a “meaningful opportunity to obtain release on parole during
[the defendant’s] lifetime”); Vasquez v. Commonwealth, 781 S.E.2d 920, 926 (Va. 2016) (declining to
grant relief under Graham to aggregated term-of-years sentence without addressing single term-of-
years sentences that exceed natural life).
 13 We note that, in Slocumb, the South Carolina Supreme Court stated that “jurisdictions

around the country are approximately evenly split” on whether to recognize de facto LWOP sentences
under Graham or Miller. 827 S.E.2d at 157 n. 17.

 - 28 -
 STATE V. KELLIHER

 Opinion of the Court

Amendment’s prohibition of cruel and unusual punishment ‘guarantees individuals

the right not to be subjected to excessive sanctions[,]’ ” 567 U.S. at 469, 183 L. Ed.

2d at 417 (emphasis added) (quoting Roper, 543 U.S. at 560, 161 L. Ed. 2d at 16), and

allowing sentencers to so easily avoid its application would render it no guarantee at

all. Any holding to the contrary ignores the fact that Graham and Miller declared

cruel and unusual those punishments imposed against redeemable juveniles that

deprive them of “ ‘some meaningful opportunity to obtain release based on

demonstrated maturity and rehabilitation.’ ” Miller, 567 U.S. at 479, 183 L. Ed. 2d

at 424 (quoting Graham, 560 U.S. at 75, 176 L. Ed. 2d at 846). Stated differently,

“[t]he court in Graham was not barring a terminology—‘life without parole’—but

rather a punishment that removes a juvenile from society without a meaningful

chance to demonstrate rehabilitation and obtain release.” Moore, 76 N.E.3d at 1139-

40.

 Many of the states that have declined to afford relief to juveniles sentenced to

de facto LWOP sentences have refused to do so under the rationale that the Supreme

Court’s decisions in Graham and Miller were limited to the specific LWOP sentences

considered in those cases. See, e.g., Lucero, 394 P.3d at 1132 (“Graham and Miller

apply only where a juvenile is sentenced to the specific sentence of life without the

possibility of parole for one offense.” (citations omitted)). However, such holdings

ignore Graham’s own caution against denying the true reality of the actual

 - 29 -
 STATE V. KELLIHER

 Opinion of the Court

punishment imposed on a juvenile when determining whether it violates the Eighth

Amendment. In pointing out that adults and juveniles who receive the same sentence

of LWOP do not, in fact, receive the same punishment, the majority in Graham stated

“[a] 16-year-old and a 75-year-old each sentenced to life without parole receive the

same punishment in name only. This reality cannot be ignored.” 560 U.S. at 70-71,

176 L. Ed. 2d at 843 (emphasis added). To hold that the factual equivalent of the

punishments prohibited by Graham and Miller is not actually prohibited by those

decisions is to deny the factual reality. Roper, Graham, and Miller are all concerned

with “imposing the harshest sentences on juvenile offenders, even when they commit

terrible crimes.” Miller, 567 U.S. at 472, 183 L. Ed. 2d at 419. A de jure LWOP

sentence is certainly as “harsh” as its functional equivalent.

 The straightforward applicability of Graham’s reasoning to de facto LWOP

sentences is clear from the reasoning itself. Its observations about juveniles’

immaturity, underdeveloped self-control, and capacity for change are true

independent of any sentence. That those characteristics undermined the punitive

justifications of LWOP is thus equally true of de facto LWOP sentences. See Carter,

192 A.3d at 726 (“The same [penological] test [from Graham] applied to a sentence of

a lengthy term of years without eligibility for parole yields the same conclusion [as

Graham].”). Retribution concerns must be measured against the culpability of

defendants, and, because juveniles—“even when they commit terrible crimes”—are

 - 30 -
 STATE V. KELLIHER

 Opinion of the Court

inherently less culpable regardless of the sentence imposed, “ ‘the case for retribution

is not as strong with a minor as with an adult.’ ” Miller, 567 U.S. at 472, 183 L. Ed.

2d at 419 (quoting Graham, 560 U.S. at 71, 176 L. Ed. 2d at 883). A de facto LWOP

sentence is no more of a deterrent to a juvenile than its de jure equivalent because,

in either case, “their immaturity, recklessness, and impetuosity[ ]make them less

likely to consider potential punishment.” Id. (citing Graham, 560 U.S. at 72, 176 L.

Ed. 2d at 844). De jure and de facto LWOP sentences are also equally incapacitating;

if incapacitation is inadequate to justify the former, id. at 472-73, 183 L. Ed. 2d at

419, then logic dictates it is inadequate for the latter. This same logic applies to

rehabilitative concerns that are in irreconcilable conflict with LWOP sentences. Id.

at 473, 183 L. Ed. 2d at 419-20. In sum, “none of what [Graham] said about children

. . . is crime-specific. . . . So Graham’s reasoning implicates any life-without-parole

sentence imposed on a juvenile[.]” Id. at 473, 183 L. Ed. 2d at 420 (emphasis added).

 The other authorities relied upon by those state courts that do not recognize

de facto LWOP challenges do not dissuade us of this holding. Several rely on language

from Justice Alito’s dissent in Graham for the proposition that it was a narrow

decision. See, e.g., Vasquez, 781 S.E.2d at 925 (“ ‘Nothing in the Court’s opinion [in

Graham] affects the imposition of a sentence to a term of years without the possibility

of parole.’ ” (quoting Graham, 560 U.S. at 124, 176 L. Ed. 2d at 877 (Alito, J.,

dissenting))). However, as other Supreme Court Justices have noted, a dissent from

 - 31 -
 STATE V. KELLIHER

 Opinion of the Court

a singular justice is not binding on the application of Supreme Court precedent.

Georgia v. Public.Resource.Org, Inc., ___ U.S. ___, ___, 206 L. Ed. 2d 732, 748 (2020)

(“As every judge learns the hard way, ‘comments in [a] dissenting opinion’ about legal

principles and precedents ‘are just that: comments in a dissenting opinion.’ ” (quoting

Railroad Retirement Bd. v. Fritz, 449 U.S. 166, 177 n. 10, 66 L. Ed. 2d 368, 377 n. 10

(1980)). See also Moore, 76 N.E.3d at 1157-58 (O’Connor, C.J., concurring) (observing

Justice Alito’s dissent in Graham is not controlling in the application of the majority’s

decision). Justice Thomas’s observation in a footnote to his dissent in Graham that

the majority did not include term-of-years sentences in calculating how many

juveniles nationwide had been sentenced to life without parole is similarly

unpersuasive. 560 U.S. at 113 n. 11, 176 L. Ed. 2d at 870 n. 11 (Thomas, J.,

dissenting). We note that a narrow reading of both Roper and Graham was expressly

rejected in Miller; there, the Arkansas Supreme Court denied a defendant’s Eighth

Amendment challenge on the grounds that “Roper and Graham were ‘narrowly

tailored’ to their contexts,” and the Supreme Court reversed. 567 U.S. at 467, 183 L.

Ed. 2d at 416. Our Supreme Court has also instructed this Court that we must

“examine each of defendant’s [Eighth Amendment and analogous state Constitution]

contentions in light of the general principles enunciated by [the North Carolina

Supreme] Court and the Supreme Court [of the United States] guiding cruel and

unusual punishment analysis.” Green, 348 N.C. at 603, 502 S.E.2d at 828 (emphasis

 - 32 -
 STATE V. KELLIHER

 Opinion of the Court

added). The “general principles enunciated” in Graham, Miller, and Montgomery are,

as explained above, applicable to de facto LWOP sentences even if the specific facts

of those decisions did not involve them.

 Those states in the minority of jurisdictions have likewise relied on federal

court decisions holding Graham and Miller do not apply to term-of-years sentences.

See, e.g., Vasquez, 781 S.E.2d at 926 (relying on Bunch v. Smith, 685 F.3d 546 (6th.

Cir. 2012)). Bunch, however, dealt with Graham in a specific context: whether, under

the deferential standard of collateral habeas review applicable to the Antiterrorism

and Effective Death Penalty Act of 1996, an Ohio court14 that sentenced a defendant

to a lengthy term-of-years sentence acted contrary to “clearly established federal

law.” 685 F.3d at 549. That standard presents a markedly different legal question

than the one considered here. See Atkins v. Crowell, 945 F.3d 476, 480 (6th Cir. 2019)

(Cole, C.J., concurring) (noting that Miller and Graham compelled the conclusion that

a de facto LWOP sentence was unconstitutional but denying habeas relief because

“[o]n occasion, AEDPA’s onerous standards require us to deny . . . relief even though

the sentence . . . is unconstitutional”).

 2. Aggregate Sentences As De Facto LWOP Sentences

 14 Ohio’s highest court later recognized de facto LWOP sentences imposed on juveniles as
violative of the Eighth Amendment in an appeal brought by Bunch’s codefendant. Moore, 76 N.E.3d
at 1139.

 - 33 -
 STATE V. KELLIHER

 Opinion of the Court

 Having held that de facto LWOP sentences for redeemable juveniles are

unconstitutional under Graham, Miller, and Montgomery, we next address whether

an aggregate punishment of concurrent sentences may amount to that unlawful

punishment. Again, state courts are sharply divided on the issue. Some states that

recognize de facto LWOP sentences do so only when imposed as a single sentence.15

Others who have rejected recognition of de facto LWOP sentences have done so on the

ground that aggregated sentences do not present such a circumstance.16 However, a

majority of courts again favor recognition of aggregated sentences as de facto LWOP

punishments subject to Graham, Miller, and Montgomery.17

 We also hold that aggregated sentences may give rise to a de facto LWOP

punishment. As other courts have observed, “[n]owhere in the Graham decision does

the Supreme Court specifically limit its holding to offenders who were convicted for

a single nonhomicide offense[.]” Boston, 363 P.3d at 457. That decision granted

Eighth Amendment protection to a juvenile irrespective of his numerous offenses:

 [O]ne cannot dispute that this defendant posed an
 immediate risk, for he had committed, we can assume,
 serious crimes early in his term of supervised release and

 15 See State v. Brown, 118 So.3d 332, 342 (La. 2013) (holding Graham does not apply to multiple
term-of-years sentences leading to release at age 86); Willbanks v. Dep’t of Corr., 522 S.W.3d 238, 246
(Mo. 2017) (en banc) (declining to extend de facto LWOP recognition to aggregated term-of-years
sentences); Foust, 180 A.3d at 434 (same).
 16 Martinez, 442 P.3d at 156-57; Vasquez, 781 S.E.2d at 926; Ali, 895 N.W.2d at 246.
 17 Reviewing cases from those jurisdictions cited supra nn. 11-12, we identify 11 states that

have rejected aggregation and 13 that have recognized it. Maryland’s highest court’s observation that
“[m]ost of the decisions in other jurisdictions applying Graham and Miller to sentences expressed in a
term of years have actually involved stacked sentences” still appears true. Carter, 192 A.3d at 732-
33.

 - 34 -
 STATE V. KELLIHER

 Opinion of the Court

 despite his own assurances of reform. Graham deserved to
 be separated from society for some time in order to prevent
 what the trial court described as an “escalating pattern of
 criminal conduct,” but it does not follow that he would be a
 risk to society for the rest of his life.

Graham, 560 U.S. at 73, 176 L. Ed. 2d at 844 (emphasis added) (citation omitted). As

for Miller, one of the appellants in that case was also convicted of two felonies, with

no apparent impact on the ultimate holding. 567 U.S. at 466, 183 L. Ed. 2d at 415.

 The applicability and scope of protection found in the Eighth Amendment

under both decisions turned on the identity of the defendant, not on the crimes

perpetrated. Graham, which followed the categorical approach used in Roper to

invalidate death penalties against minors, noted that such categorical cases “turn[]

on the characteristics of the offender[.]” 560 U.S. at 61, 176 L. Ed. at 837. Although

Graham itself stated that “the age of the offender and the nature of the crime each

bear on the analysis[,]” 560 U.S. at 69, 176 L. Ed. 2d at 842, the identity of the

offender as a juvenile was of primary importance as recognized in Miller and

Montgomery: “The ‘foundation stone’ for Miller’s analysis was this Court’s line of

precedent holding certain punishments disproportionate when applied to

juveniles. . . . Miller took as its starting premise the principle established in Roper

and Graham that ‘children are constitutionally different from adults for purposes of

sentencing.’ ” Montgomery, ___ U.S. at ___, 193 L. Ed. 2d at 618 (emphasis added)

(citations omitted). Miller appropriately recognized that “none of what [Graham] said

 - 35 -
 STATE V. KELLIHER

 Opinion of the Court

about children . . . is crime-specific. Those features are evident in the same way, and

to the same degree, when (as in both cases here) a botched robbery turns into a killing.

So Graham’s reasoning implicates any life-without-parole sentence imposed on a

juvenile[.]” 567 U.S. at 473, 183 L. Ed. 2d at 420. That is, the categorical prohibition

is principally focused on the offender, not on the crime or crimes committed.

 The states that have not recognized aggregate punishments as de facto LWOP

sentences have done so on grounds that we hold distinguishable. For example,

Pennsylvania rejected the argument on the basis that its caselaw “has long disavowed

the concept of volume discounts for committing multiple crimes.” Foust, 180 A.3d at

436. North Carolina law is not so averse. To be sure, our Supreme Court has held

that “[t]he imposition of consecutive life sentences, standing alone, does not constitute

cruel or unusual punishment. A defendant may be convicted of and sentenced for

each specific act which he commits.” State v. Ysaguire, 309 N.C. 780, 786, 309 S.E.2d

436, 441 (1983) (citations omitted). However, such consecutive sentences are not

“standing alone” when they also involve a juvenile defendant. Cf. Graham, 560 U.S.

at 70-71, 176 L. Ed. 2d at 843 (“A 16-year-old and a 75-year-old each sentenced to life

without parole receive the same punishment in name only. This reality cannot be

ignored.” (citations and quotations omitted)). We note our own caselaw and statutes

compel the State to consider consecutive sentences as a single punishment. See N.C.

Gen. Stat. 15A-1354(b) (2019) (“In determining the effect of consecutive

 - 36 -
 STATE V. KELLIHER

 Opinion of the Court

sentences . . . , the Division of Adult Correction and Juvenile Justice of the

Department of Public Safety must treat the defendant as though he has been

committed for a single term[.]”); Robbins, 127 N.C. App. at 165, 487 S.E.2d at 773

(holding parole eligibility for consecutive sentences must be calculated as if serving a

single term).

 Other states have found persuasive the following non-binding dicta from the

Supreme Court’s decision in O’Neil v. Vermont: “ [‘]It would scarcely be competent for

a person to assail the constitutionality of the statute prescribing a punishment for

burglary, on the ground that he had committed so many burglaries that, if

punishment for each were inflicted on him, he might be kept in prison for life.[’] ” 144

U.S. 323, 331, 36 L. Ed. 450, 455 (1892) (quoting the Vermont Supreme Court). We

do not deem this language adequate to counter Roper, Graham, Miller, and

Montgomery; needless to say, O’Neil did not involve juveniles, and long predated the

express adoption of categorical Eighth Amendment prohibitions in juvenile cases that

primarily focus not on the crimes committed but instead “turn[] on the characteristics

of the offender.” Graham, 560 U.S. at 61, 176 L. Ed. 2d at 837; see also Moore, 76

N.E.3d at 1142 (“Whether the sentence is the product of a discrete offense or multiple

offenses, the fact remains that it was a juvenile who committed the one offense or

several offenses and who has diminished moral culpability.” (emphasis in original)).

 - 37 -
 STATE V. KELLIHER

 Opinion of the Court

In short, “O’Neil . . . does not indicate anything about the Supreme Court’s view on

the matter.” Ira, 419 P.3d at 166.

 3. Defendant’s Sentences Are an Unconstitutional De Facto LWOP
 Punishment

 The final question posed by Defendant’s argument is whether his consecutive

sentences, which place his eligibility for parole at 50 years and earliest possible

release at age 67, are sufficiently lengthy to constitute an unconstitutional de facto

LWOP punishment in light of the trial court’s determination that he is neither

irredeemable nor irreparably corrupt. Though the issue of identifying de facto LWOP

sentences certainly presents some practical challenges, we hold that Defendant’s

consecutive sentences of life and parole eligibility at 50 years constitute a de facto

LWOP punishment.

 Several courts have held de facto LWOP sentences that do not conclusively

extend beyond the juvenile’s natural life are nonetheless unconstitutional sentences,

and many of them have found such sentences to exist when release (either through

completion of the sentence or opportunity for parole) is only available after roughly

50 years, and sometimes less.18 Those states have adopted differing methods for their

 18See Zuber, 152 A.3d at 212-13 (55 years); State ex rel. Carr, 527 S.W.3d at 57 (50 years);
People v. Contreras, 411 P.3d 445, 446 (Cal. 2018) (50 years); Carter, 192 A.3d at 734 (50 years);
Casiano, 115 A.3d at 1035 (50 years); Bear Cloud, 334 P.3d at 136 (45 years); People v. Buffer, 137
N.E.3d 763, 774 (Ill. 2019) (40 years). Courts that have not identified an exact point at which a de facto
LWOP sentence arises have indicated that 50 years is close to the limit. See, e.g., Ira, 419 P.3d at 170
(“Certainly the fact that Ira will serve almost 46 years before he is given an opportunity to obtain

 - 38 -
 STATE V. KELLIHER

 Opinion of the Court

delineations, see Carter, 192 A.3d at 727-28 (surveying decisions and identifying five

different means). Though the State rightly points out that the task of demarcating

the bounds of a de facto LWOP sentence may be difficult, the task is not impossible.

 For example, retirement age has been used to discern whether a sentence is a

de facto LWOP punishment. Id. at 734. North Carolina’s Constitution provides that

persons’ “inalienable rights” include the “enjoyment of the fruits of their own labor,”

N.C. Const. Art. I, § 1, and our Supreme Court has recognized that “a law which

destroys the opportunity of a man or woman to earn a living in one of the ordinary

harmless occupations of life . . . is legal grotesquery.” State v. Harris, 216 N.C. 746,

759, 6 S.E.2d 854, 863 (1940). It is difficult, then, to deny that incarcerating a juvenile

with no hope for release until or after the point at which society no longer considers

them an ordinary member of the workforce seems to run afoul of the “hope for some

years of life outside prison walls” required by Graham and Miller. Montgomery, ___

U.S. at ___, 193 L. Ed. 2d at 623. Stated differently:

 [T]he language of Graham suggests that the high court
 envisioned more than the mere act of release or a de
 minimis quantum of time outside of prison. Graham spoke
 of the chance to rejoin society in qualitative terms—"the
 rehabilitative ideal” ([Graham] at 130 S. Ct. 2011)—that
 contemplate a sufficient period to achieve reintegration as
 a productive and respected member of the citizenry. The

release is the outer limit of what is constitutionally acceptable.” (citation omitted)). The 50-year mark
identified by several courts “seems consistent with the observation of the Graham Court that the
defendant in that case would not be released ‘even if he spends the next half century attempting to
atone for his crimes and learn from his mistakes.’ ” Carter, 192 A.3d at 728-29 (quoting Graham, 560
U.S. at 79, 176 L. Ed. 2d at 848).

 - 39 -
 STATE V. KELLIHER

 Opinion of the Court

 “chance for reconciliation with society” (id. at 130 S. Ct.
 2011), “the right to reenter the community” (id. at 130 S.
 Ct. 2011), and the opportunity to reclaim one’s “value and
 place in society” (ibid.) all indicate concern for a measure
 of belonging and redemption that goes beyond mere
 freedom from confinement. . . . Confinement with no
 possibility of release until age 66 or age 74 seems unlikely
 to allow for the reintegration that Graham contemplates.

Contreras, 411 P.3d at 454. To release an individual after their opportunity to

directly contribute to society—both through a career and in other respects, like

raising a family—“does not provide a ‘meaningful opportunity’ to demonstrate the

‘maturity and rehabilitation’ required to obtain release and reenter society as

required by Graham.” Null, 836 N.W.2d at 71 (quoting Graham, 560 U.S. at 74, 176

L. Ed. 2d at 845-46). Lastly, we observe that our General Assembly has elsewhere

defined what an appropriate life with parole sentence in compliance with Miller looks

like; N.C. Gen. Stat. § 15A-1340.19A (2019), the statute enacted for that purpose,

provides that “ ‘life imprisonment with parole’ shall mean that the defendant shall

serve a minimum of 25 years imprisonment prior to becoming eligible for parole.”19

 19 Defendant asserted at oral argument, that, as a matter of statutory construction, juveniles
sentenced to first-degree murder under N.C. Gen. Stat. § 15A-1340.19A, et seq. must be given parole
eligibility at 25 years. Defendant never raised the issue before the trial court, nor did he brief any
statutory interpretation arguments; any arguments as to the purported construction and
interpretation of N.C. Gen. Stat. § 15A-1340.19A, et seq. have not been presented in this appeal. See
N.C. R. App. P. 28(a) (2020) (“Issues not presented and discussed in a party’s brief are deemed
abandoned.”). We therefore do not address the statutory construction of N.C. Gen. Stat. § 15A-
1340.19A and instead look to it as an expression of the General Assembly’s judgment on what
constitutes a constitutionally permissible juvenile life sentence following Miller—an issue that was
expressly argued and addressed by the parties in their briefs.

 - 40 -
 STATE V. KELLIHER

 Opinion of the Court

 A holding that Defendant’s sentences constitute a de facto LWOP sentence is

in line with the above; his ineligibility for parole for 50 years falls at the limit

identified by numerous other jurisdictions as constituting an unconstitutional de

facto LWOP sentence, and it affords him release only at or after retirement age. See

United States v. Grant, 887 F.3d 131, 151 (surveying various means of calculating

retirement age and observing “by all accounts, the national age of retirement to date

is between sixty-two and sixty-seven inclusive”), reh’g en banc granted, opinion

vacated, 905 F.3d 285 (3rd Cir. 2018).

 As far as identifying what a sentence that would not amount to a de facto

LWOP punishment, our General Assembly has offered some indication. See N.C.

Gen. Stat. § 15A-1340.19A. The definition provided therein is not strictly limited to

single offenses: “If the sole basis for conviction of a count or each count of first degree

murder was the felony murder rule, then the court shall sentence the defendant to

life imprisonment with parole.” N.C. Gen. Stat. § 15A-1340.19B(a)(1) (2019).

Defendant here has clearly abandoned any assertion that he was convicted under the

felony murder rule. But N.C. Gen. Stat. § 15A-1340.19B(a)(1) nonetheless indicates

that our General Assembly has determined parole eligibility at 25 years for multiple

offenses sanctionable by life with parole is not so excessive as to run afoul of Miller.

See, e.g., Ramos, 387 P.3d at 661-62 (noting that “[s]tate legislatures are . . . allowed

some flexibility in fashioning the methods for fulfilling Miller’s substantive

 - 41 -
 STATE V. KELLIHER

 Opinion of the Court

requirements, so long as the State’s approach does not ‘demean the substantive

character of the federal right at issue.’ ” (quoting Montgomery, ___ U.S. at ___, 193

L. Ed. 2d at 621)). This Court has twice held that life with the possibility of parole

after 25 years does not constitute a de facto LWOP sentence subject to Miller. See

State v. Jefferson, 252 N.C. App. 174, 181, 798 S.E.2d 121, 125 (2017) (“Defendant’s

sentence is neither an explicit nor a de facto term of life imprisonment without parole.

Upon serving twenty-five years of his sentence, Defendant will become eligible for

parole[.]”); State v. Seam, 263 N.C. App. 355, 361, 823 S.E.2d 605, 609-10 (2018)

(holding Miller’s individualized sentencing requirement inapplicable to a single

sentence of felony murder carrying mandatory punishment of life imprisonment with

the opportunity for parole after 25 years), aff’d per curiam, 373 N.C. 529, 837 S.E.2d

870 (2020).

 We stress, as the Supreme Court did in Graham, that nothing in our decision

compels the State to actually release Defendant after 25 years. The Post-Release

Supervision and Parole Commission will ultimately decide whether Defendant may

be released in his lifetime. Our decision simply upholds the Eighth Amendment’s

constitutional requirement that Defendant, as a juvenile who is neither incorrigible

nor irredeemable, have his “hope for some years of life outside prison walls . . .

restored.” Montgomery, ___ U.S. at ___, 193 L. Ed. 2d at 623.

 III. CONCLUSION

 - 42 -
 STATE V. KELLIHER

 Opinion of the Court

 The facts, the law, and all that results in this appeal are difficult. As shown

by the victim impact statements offered at resentencing, the murders of Mr.

Carpenter and Ms. Helton—two teenagers who were soon to be parents—caused

irreparable loss and irrevocable harm to victims and their families. Defendant was

shaped by what was a profoundly troubled childhood, leading him to actively

participate in these truly heinous crimes. These facts have led this Court in

reviewing Defendant’s constitutional claims that have divided courts nationwide, to

discuss the difficult subject of sentencing, for outrageous acts, a juvenile offender who

is inherently less culpable than adults and was found by the trial court to be

redeemable. “Few, perhaps no, judicial responsibilities are more difficult than

sentencing.” Graham, 560 U.S. at 77, 176 L. Ed. 2d at 847. This case is certainly no

exception, as the trial court explained following resentencing: “[T]hese are real

tragedies. . . . [T]hey don’t put [you] in positions like this because you’re weak or

because you’re a coward. If you can’t, you know, make hard decisions, you will never

last as a judge and you will never last as a prosecutor or a defense lawyer.” Indeed,

when it comes to sentencing juveniles for the most egregious crimes, these difficulties

are heightened; in such circumstances, the (in)humanity of the perpetrator, the

victims, the crimes, and the punishment are inseparable under the Eighth

Amendment.

 - 43 -
 STATE V. KELLIHER

 Opinion of the Court

 This Court’s duty is to uphold the federal and state Constitutions irrespective

of these difficulties. In determining Defendant’s appeal, we hold under Eighth

Amendment jurisprudence: (1) de facto LWOP sentences imposed on juveniles may

run afoul of the Eighth Amendment; (2) such punishments may arise out of

aggregated sentences; and (3) a sentence that provides no opportunity for release for

50 or more years is cognizable as a de facto LWOP sentence. Consistent with the

Eighth Amendment as interpreted by Roper, Graham, Miller, and Montgomery, these

holdings compel us to reverse and remand Defendant’s sentence. Under different

circumstances, we would leave resentencing to the sound discretion of the trial court.

See, e.g., State v. Nunez, 204 N.C. App. 164, 170, 693 S.E.2d 223, 227 (2010)

(remanding for resentencing and noting that, on remand, “[w]hether the two

sentences should run concurrently or consecutively rests in the discretion of the trial

court”). Here, however, we hold that of the two binary options available—consecutive

or concurrent sentences of life with parole—one is unconstitutional. We therefore

instruct the trial court on remand to enter two concurrent sentences of life with parole

as the only constitutionally permissible sentence available under the facts presented.

 REVERSED AND REMANDED.

 Judges BRYANT and HAMPSON concur.

 - 44 -